IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| HYSITRON INCORPORATED, <br> a Minnesota corporation, <br><br> Plaintiff, <br><br> v. <br><br> MTS SYSTEMS CORPORATION, <br> a Minnesota corporation, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 07 CV 1533 ADM/AJB |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S
## MOTION TO COMPEL DISCOVERY

Defendant MTS Systems Corporation ("MTS") filed this motion in an attempt to force Hysitron Incorporated ("Hysitron") to gather and produce volumes of completely irrelevant information. Ignoring the true broad scope of its requests, and the vast amounts of irrelevant information they encompass, MTS offers strained arguments that it needs the requested information in order to build its defenses. This motion is simply yet another effort by MTS to use litigation to distract and harm its competitor rather than as a means to obtain justice. The Court should prevent MTS from using litigation to achieve such improper objectives.

**FACTUAL BACKGROUND**

**I. HYSITRON INVENTED THE FIRST INDENTATION DEVICE HAVING *IN SITU* IMAGING CAPABILITIES.**

Since opening its doors in 1992, Hysitron has been a leader in the development of products used to perform nanoscale[1] surface analysis. Hysitron's products offer researchers and manufacturers the ability to take accurate nanoscale measurements of mechanical properties of materials such as hardness, elastic modulus, friction, wear resistance, and adhesive strength.

Hysitron sells a variety of high-precision products capable of performing many different nanotechnology analytical techniques. Hysitron offers a large portfolio of indentation testing devices. Indentation testing devices are machines that analyze mechanical properties of materials by applying a force to the surface of a material and analyzing the impact that force had on the material. These machines must be very sensitive, as indentations are analyzed down to the micro- and nano-scale.

Hysitron did not stop development after creating its first indentation testing device, and these continued development efforts paid off. Hysitron was the first company to develop an indentation device capable for performing *in situ* imaging. With Hysitron's invention (which is also referred to as a "scanned probe microscope apparatuses"), an indentation testing device can also be used to produce an image representing the surface topography of a test sample. This improvement to indentation

---

[1] The scientific prefix "nano" represents a magnitude of $10^{-9}$, whereas a "milli," for instance, represents a magnitude of $10^{-3}$. Thus, there are 1,000 millimeters or a billion nanometers in a meter. The analysis of surface properties of materials that are mere nanometers thick requires extremely sensitive instrumentation.

testing devices – not all indentation testing devices themselves – is the subject of Hysitron's patents in suit.

Prior to Hysitron's invention, there were no indentation testing devices available on the market that could perform *in situ* imaging of the surfaces of test specimens. As a result, people had to perform indentation tests using one device, followed by surface analysis using a separate microscope device. (*See* Declaration of Todd S. Werner ("Werner Decl.") Ex. A (U.S. Patent No. 6,026,677) at col. 2, l. 65 – col. 3, l. 3.) This strategy was time consuming, expensive, and inaccurate. For instance, locating the indent on the material for analysis with a microscope device was not a trivial task:

> This involves significant work in sample preparation, especially for samples that are electrical insulators and need to be gold or carbon coated before imaging on the scanning electron microscope. Also, just finding the tiny indent or scratch is not trivial. For the smallest indents and scratches, the atomic level resolution of the scanning tunneling microscope or atomic force microscope may be required to accurately resolve the scratch widths and areas of delamination. Researchers have reported spending up to eight hours locating an indent on the atomic force microscope after producing it on a separate microindentor.

(*Id.* at col. 3, ll. 9 - 20.)

The lengthy period of time between measurements led to additional problems.

> Another source of uncertainty is plastic flow or relaxation that may take place with certain samples. If this occurs over time periods of an hour or less, an indent produced by a separate indentor may disappear before it can be inspected on a microscope. Indents made in the 50 Angstrom range, have sometimes indicated plastic deformations that could not be seen with the scanning electron microscope or atomic force microscope imaging. Possible explanations include mechanical hysterisis in the indentor causing it to indicate plastic deformation that was not actually present. It is also possible that there actually was an indent present that the researcher was

3

> not able to locate. A third possibility is that the sample exhibited a relaxation effect where the indent was actually present, but disappeared by some plastic flow phenomena before the sample could be observed in the microscope.

(*Id.* at col. 3, ll. 21-36.). By providing an indentation device that could perform *in situ* imaging, Hysitron's invention eliminated these problems. (*Id*. at col. 3, ll. 37-42.)

After Hysitron made its first indentation testing device with *in situ* imaging, it continued its development efforts and has developed a number of additional indentation devices having other improved features. These subsequent efforts do not relate to Hysitron's development of the invention claimed in the patents in suit.

MTS, which initially voiced skepticism about the operability of indentation testing devices with *in situ* imaging, eventually followed Hysitron's lead and began selling its own indentation testing devices with *in situ* imaging. These devices infringe Hysitron's patents.

## II.     MTS REQUESTS INFORMATION CONCERNING A SCOPE OF TECHNOLOGY FAR BEYOND THE CLAIMED INVENTION.

Consistent with the foregoing description, the patents in suit unambiguously claim an "improvement" to an indentation testing device. (*See, e.g.*, Werner Decl. Ex. A, claim 1, 7, 16 ("In a scanned probe microscope apparatus . . . the apparatus improvement comprising . . . .").)

MTS ignores the scope of the claimed inventions, instead seeking all kinds of documents relating to other areas of technology, including microindentation apparatuses in general, surface imaging apparatuses, and multi-plate capacitors. MTS tries to ignore the claim language in favor of the titles of the patents. MTS cannot debate that the claims

define the invention, not the title of the patent. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1312 (Fed. Cir. 1999); *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1111 (Fed. Cir. 2000).

The discovery sought by MTS is akin to requesting all documents related to the development of cars (microindentation apparatuses), development of motorcycles (surface imaging apparatuses), and development of carburetors (multi-plate capacitors) when the patented invention is an automatic transmission for cars. There is simply no reason MTS should want discovery of the scope it seeks other than to harass its competitor. Forcing Hysitron to draft responses to ninety-eight separate document requests was apparently not enough.

**III. MTS USES THIS MOTION TO LAUNCH A BELATED ATTACK ON THE COURT'S DENIAL OF ITS MOTION FOR A STAY.**

Not only does MTS seek documents beyond the technology at issue, it seeks documents that have absolutely no bearing on the claims and defenses alleged in this case. The Court long ago determined that a stay of this lawsuit pending reexamination of the patents in suit was not proper. MTS attempts to re-raise the issue in the form of a motion to compel. The requested information has no bearing on any claims or defenses alleged in this action. The production of this information serves no purpose other than to force Hysitron to waste time and resources collecting and producing irrelevant documents.

## IV. MTS' IGNORES ITS UNCLEAN HANDS WHEN CHALLENGING HYSITRON'S DISCOVERY PRACTICES.

MTS attempts to argue that Hysitron has been dragging its feet in this litigation, contending that Hysitron has given itself a *de facto* 6 week extension of time to produce documents in response to MTS' first set of discovery requests. (Docket Entry No. 54 at 3.)

In attempting to portray Hysitron as a bad actor, MTS ignores its own conduct. Hysitron served its first set of document requests on May 23, 2007. MTS did not produce a single document until September 21, 2007, three months past the deadline. Yet MTS complains about a delay half the amount of time of its own delay. MTS is in no position to complain. In all events, Hysitron is in the process of reviewing documents for production and will be producing documents and supplementing interrogatory responses in the near future.

## ARGUMENT

MTS asks the Court to compel the production of irrelevant information. The Court should decline MTS' requests. Discovery is not without limits; rather, parties may only obtain discovery of information relevant to the claims and defenses pled by the parties. Fed. R. Civ. P. 26(b)(1). Discovery should not be allowed to become a fishing expedition. *Upsher-Smith Labs., Inc. v. Mylan Labs., Inc.*, 944 F. Supp. 1411, 1444 (D. Minn. 1996). "[S]ome threshold showing of relevance must be made before parties are required to produce a variety of information which does not reasonably bear upon the issues in the case." *Id*. Parties should not be permitted to "roam in the shadow zones of

relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so." *Id*. (denying motion to compel information sought in a document request seeking information that would "impose an inordinate and expensive burden for information marginally relevant at most").

In *Funai Electric Company., Ltd. v. Orion Electric Company, Ltd.*, the accused infringer filed a motion to compel the patentee's production of documents concerning the development of technology relating to any video cassette device. No. 02-Civ-2605, 2002 U.S. Dist. LEXIS 14466, at *10-*11, *14 (S.D.N.Y. Aug. 2, 2002). The patentee responded by agreeing to produce documents concerning only those products that fell within the scope of the claims of the asserted patents. *Id*. The court agreed with the patentee and refused to compel the production of documents outside the scope of the claims. *Id*. This motion warrants the same ruling.

Even when the requested information is relevant, however, "discovery is not permitted where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery." *Pinnacle Pizza Co. v. Little Ceaser Enters., Inc.*, No. 04-4170, 2005 U.S. Dist. LEXIS 41062, at *10 (D.S.D. November 2, 2005). The Federal Rules preclude discovery that would effect an undue burden based on expense, inconvenience, and the invasion of any privileges. *E\*Trade Secur. LLC v. Deutsche Bank AG*, No. 02-3711, 2005 U.S. Dist. LEXIS 3038, at *12 (D. Minn. Jan. 31, 2005). The Court must determine that the benefit of the requested discovery outweighs the burden it will impose upon the party from whom discovery is sought before compelling

that party to produce the requested information. *Id*. Courts also apply a heightened relevancy standard to competitive information such as patent applications, recognizing the objecter's legitimate interests in maintaining the secrecy of such information. *ICU Med., Inc. v. B. Braun Med., Inc.*, 224 F.R.D. 461, 462 (N.D. Cal. 2002) (refusing to compel production of patent applications even though the court deemed them relevant where parties were direct competitors).

**I.    REQUESTS NOS. 5, 10, AND 11 SEEK DOCUMENTS CONCERNING TECHNOLOGY THAT IS NOT AT ISSUE IN THIS LAWSUIT.**

In Request Nos. 5, 10, and 11 MTS asks Hysitron to produce documents related to any work, research, tests, experiments, or studies concerning scanned probe microscope apparatuses, microindentation apparatuses, surface imaging apparatuses, and/or multi-plate capacitor systems. MTS also seeks documents concerning any patent prosecution efforts concerning all of these types of devices and areas of technology.

Hysitron does not dispute that this information is relevant to the issue of validity ***to the extent it concerns Hysitron's development of the claimed invention***: indentation testing device with *in situ* imaging. Hysitron has agreed to produce those documents.

Documents concerning indentation apparatuses, surface imaging apparatuses, and/or multi-plate capacitor systems in general, however, lack any relevance to the parties' claims and defenses in this matter. The fact these kinds of apparatuses are mentioned in the patent does not somehow render this information relevant. The claims define the invention, and the claims limit the scope of the invention to indentation testing devices having *in situ* imaging capabilities. Hysitron has designed and sells indentation

8

apparatuses that do not incorporate the claimed invention. Similarly, Hysitron sells devices that have optical components that essentially take a picture of specimen surfaces – again, not the invention claimed in the patents in suit. These requests would require Hysitron to produce documents concerning these other devices despite the fact this technology does not relate in any way to the claimed invention. The requests are improper. *See, e.g., Funai Elec. Co.* 2002 U.S. Dist. LEXIS 14466, at *14 (denying motion to compel the production of documents concerning patentee's products outside the scope of the claims of the asserted patents).

By analogy, Hysitron's invention is automatic transmission for cars, and MTS tries to force Hysitron to gather and produce documents concerning the development of cars (including cars with manual transmissions), motorcycles, and carburetors. Production of this information serves no purpose other than harassing and burdening Hysitron.

This request is also overly broad because it does not contain a limitation as to time. Hysitron's continuing development of indentation testing devices is not relevant to the validity of the asserted claims of the patents in suit. Hysitron should not be required to produce documents concerning development efforts for technology and instruments beyond that claimed in the patent-in-suit. While MTS offers to reduce the time frame to 1990-1996, that time period is still overbroad because the claimed invention was first sold in 1995 and reduced-to-practice before that. Similarly, Hysitron did not begin its development efforts until well after 1990.

Request No. 11 seeks documents related to patent applications filed by Hysitron unrelated to the patents in suit. Not only is this information irrelevant, it is highly competitive, secret information. Hysitron should not be required to reveal such commercially sensitive – and irrelevant – information to MTS, a direct competitor. MTS has not satisfied the heightened requirements it must meet in order to obtain discovery of such information. *ICU Med.*, 224 F.R.D. 461, 462 (refusing to compel production of patent applications even though the court deemed them relevant where parties were direct competitors).

Since the requests are overly broad, and require the production of volumes of irrelevant, commercially sensitive information, the Court should deny MTS' motion to compel the production of documents in response to Request Nos. 5, 10, and 11. Hysitron has already agreed to produce all relevant documents encompassed by these requests.

## II. REQUEST NOS. 23-26 SEEK IRRELEVANT AGREEMENTS.

In Requests Nos. 23-25, MTS asks the Court to force Hysitron to produce all licenses, contracts, and agreements "relating to any Hysitron scanned probe [microscope], microindentation and/or surface imaging product." Each of these requests is overbroad. Hysitron has agreed to produce all relevant, responsive documents, namely, licenses and assignments related to its scanned probe microscopes. All other documents responsive to these requests do not relate to any claims or defenses alleged in this lawsuit.

While these requests seek much more than just licensing agreements, MTS' arguments in support of these requests only address licensing agreements. MTS does not

contest Hysitron's position that agreements other than licenses and assignments are not relevant.

Even within the subcategory of licensing agreements, the requests are still overbroad. MTS argues that Court's give weight to licensing customs in the industry and actual licenses on comparable patents in assessing a reasonable royalty based upon a patent law treatise. Request Nos. 23-25 are not limited to "licensing customs in the industry" or "actual licenses on comparable patents." The requests expand into other types of products involving different technologies and market conditions because they seek documents relating to microindentation testing devices without *in situ* imaging and surface imaging products in general.

More fundamentally, however, even licenses on comparable patents are "rarely given decisive or even substantial effect due to the generally unique character of patented inventions and of the circumstances under which they are developed and exploited." Donald S. Chisum, *Chisum on Patents* § 20.03[3][b][ii] at pp. 20-208-20-209 (2007). Hysitron's development of indentation testing devices with *in situ* imaging was a groundbreaking innovation. Any royalty rate for a license to the claimed invention would need to reflect Hysitron's significant advancement. Licenses Hysitron has executed relating to products in other areas, and trivial or insignificant components on other nanotechnology devices, would not reflect this fact and fail to inform the reasonable royalty analysis. The burden for Hysitron to gather and produce such information outweighs any relevance MTS could contend it has. *Pinnacle Pizza*, 2005 U.S. Dist. LEXIS 41062, at *10.

Hysitron's agreement to produce licenses related to its scanned probe microscopes represents all relevant, responsive documents, and the Court should deny MTS' motion to compel all other documents responsive to Request Nos. 23-25, which are irrelevant.

MTS also seeks all documents and things relating to any agreements, assignments, encumbrances or licenses relating to the patents in suit or any applications claiming priority thereto in Request No. 26. As mentioned, Hysitron has agreed to produce all licenses or assignments relating to the patents in suit. When asked what other types of agreements MTS contends are relevant during the parties meet and confer, MTS could not identify any other types of agreements. Hysitron respectfully submits it has agreed to produce all relevant documents that MTS seeks in Request No. 26, and MTS' motion with respect to this request is moot.

## III. REQUEST NOS. 34-35 SEEK IRRELEVANT COMMUNICATIONS.

Continuing with its efforts to force Hysitron to collect, review and produce irrelevant documents, MTS asks the Court to compel documents concerning all communications related to MTS without regard to the subject matter of such communications. Request No. 34 seeks all documents and things concerning any communications with third parties relating to the patents-in-suit or this lawsuit. Request No. 35 seeks all documents and things concerning any internal communications relating to the patents-in-suit or this lawsuit.

Hysitron has agreed to produce communications concerning this lawsuit or the validity or enforceability of the patents-in-suit. Despite this appropriate limitation to the requests, MTS continues with its efforts to force Hysitron to produce irrelevant

documents.  In fact, by contending that "MTS is entitled to production of *all* non-privileged communications regarding the patents in suit so that it can independently determine whether the communications bear on the validity or enforceability of the patents," MTS implicitly concedes that its request encompasses irrelevant documents. (*See* Docket Entry No. 54 at 12.)  The argument also turns the rules regarding discovery on their head.

MTS asserts that Hysitron will be free to "arbitrarily pick and choose among discoverable documents to select which ones will be produced." (Docket Entry No. 54 at 12.)  Hysitron takes issue with this assertion, which suggests that Hysitron will disregard its ethical obligations.  Every document request requires a party to review its own documents and make a determination as to responsiveness.  The same rules apply here. MTS has no right to rummage through Hysitron's documents unfettered.

MTS asserts that additional communications concerning the patents-in-suit could possibly offer evidence relative to the reasonable royalty.  Discovery is not a fishing expedition.  *Upsher-Smith*, 944 F. Supp. 1411, 1444 (ruling that parties should not be permitted to "roam in the shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so").  Rule 34 requires that the documents sought be identified with reasonably particularity.  MTS' inability to articulate what kinds of other documents it seeks confirms MTS is engaging in a forbidden fishing expedition.

Hysitron has agreed to produce all relevant documents responsive to Request Nos. 34-35, and MTS' motion to compel the production of irrelevant documents in response to this request should be denied.

## IV. REQUEST NO. 47 IS HOPELESSLY OVERBROAD AND REDUNDANT.

MTS asks Hysitron to produce "all projections, forecasts, market share reports and forecasts, marketing acceptance documents, business plans, strategic plans, fiscal plans, marketing strategies and plans, sales strategies and plans and advertising strategies and plans relating to the sale and anticipate [sic] sale of scanned probe microscope apparatuses, microindentation apparatuses, surface imaging apparatuses, and/or multi-plate capacitor systems." MTS agreed to Hysitron's contention that the scope of technology encompassed by this response was excessive, and agreed it had to limit the request to Hysitron's commercial embodiments of the claimed invention. Nonetheless, the request remains overbroad.

MTS suggests the requested information is necessary for it to perform a lost profits analysis. MTS does not address the fact that Hysitron has agreed to produce damages-related documents in response to a number of other requests served by MTS. Specifically, Hysitron agreed to produce documents sufficient to assess the sales, revenues, costs, and profits attributable to Hysitron's commercial embodiments of the inventions claimed in the patents-in-suit in response to Request Nos. 37 and 40-46. Hysitron also agreed to produce market share analyses from 1992 to present concerning scanned probe microscope apparatuses in response to Request No. 48, and communications with all potential purchasers of its products in response to Request No.

14

56. This information will fully enable MTS to perform a "but for" analysis for purposes of challenging Hysitron's claims for lost profits.

Any remaining information sought in this request is irrelevant to the lost profits analysis, which provides for Hysitron's recovery for each sale it lost because of MTS's infringement. This analysis does not require consideration of Hysitron's business plans, strategies, or expectations. Consequently, projections, forecasts, plans, and strategies are not relevant to the lost profits analysis. Hysitron has agreed to produce market share reports.

MTS contends that the requested information is also relevant to the reasonable royalty analysis because court's consider "the state of development and commercialization of the patent's commercial embodiment." (Docket Entry No. 54 at 14.) The reasonably royalty analysis involves a hypothetical negotiation between the parties that is conducted **at the time infringement began**. *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 870 (Fed. Cir. 1993). Hysitron made its first sale of an indentation testing device with *in situ* imaging in 1995 while MTS did not enter the marketplace until about 2002, seven years later. MTS cannot debate that Hysitron had fully developed its invention long before MTS entered the marketplace in 2002.[2] Even so, the previously discussed market and sales information Hysitron has already agreed to produce will confirm that Hysitron had fully developed and commercialized the invention. Hysitron

---

[2] The hypothetical negotiation of a reasonably royalty would have taken place in 2002. Thus, the request is also overbroad because it is requires the production of documents concerning plans and events occurring that would not relate to conditions during this time frame.

15

should not be compelled to endure the burdensome production of irrelevant information MTS seeks in this request.

As a last ditch effort to justify the extreme breadth of Request No. 47, MTS suggests this information relates to its infringement of the HYSITRON trademark, a basis for discovery MTS never offered during the parties' meet and confers on the issue. (*See* Werner Decl. Ex. B.) This contention is meritless on its face. This request does not even mention the HYSITRON mark and is not tailored to information about the mark, or Hysitron's use of its mark, but to particular products Hysitron sells.

MTS contends the requested information is needed to analyze the identity and characteristics of purchasers of Hysitron's commercial embodiments of the patents in suit, how purchasers go about choosing which product to buy, and how Hysitron and its competitors market their products. (Docket Entry No. 54 at 15.) Hysitron has agreed to produce its advertisements, brochures, marketing materials, documents sufficient to identify its targeted market, and communications with all potential purchasers of its commercial embodiment of the patents in suit in response to Request No. Request Nos. 38, 56, 75-78, and 81. Hysitron also agreed to produce documents concerning the distinctiveness, reputation, and recognition of the HYSITRON mark in response to Request No. 2. These documents will provide MTS discovery relevant to these issues. Projections, forecasts, business plans, strategic plans, fiscal plans and the other documents sought in Request No. 47 do not relate to these trademark issues.

Given the lack of relevance these documents have to the trademark issues in this case, the commercially sensitive nature of the requested information, and Hysitron's

agreement to produce documents relevant to its trademark infringement claim, the production of irrelevant documents in response to Request No. 47 would be unduly burdensome. The Court should deny MTS' motion to compel the production of documents in response to Request No. 47.

## V. REQUEST NO. 60 MUST BE LIMITED AS TO SUBJECT MATTER BECAUSE MTS AND HYSITRON COMPETE IN A NUMBER OF MARKETPLACES.

Request No. 60 requires the production of all Hysitron meeting minutes and notes since January 1, 1996, that refer to MTS, the patents-in-suit, or this lawsuit. Hysitron agreed to produce responsive documents relating to the patents-in-suit. This necessarily encompasses all responsive documents concerning this lawsuit.

MTS refused to accept a subject matter limitation on this request, contending that every meeting minute or note referencing MTS is relevant. Clearly, the request is overbroad. MTS and Hysitron sell many different competing products, some of which are not even indentation testing devices. Without the subject matter limitation proposed by Hysitron, this request is improper. *See, e.g., Funai Elec. Co.* 2002 U.S. Dist. LEXIS 14466, at *12 (denying motion to compel the production of documents concerning communications about competitor's products not charged with infringement). This is especially true where, as here, the requested documents would require the disclosure of very confidential, competitive information concerning products sold by MTS that are not involved in this lawsuit. The request is also overbroad because it lacks a temporal limitation. MTS did not even begin selling the products accused of infringement until about 2002.

MTS argues that this information is relevant to its damages analysis because it will reveal the competitive relationship between the parties. That is not a disputed issue. Furthermore, Hysitron agreed to produce all documents relevant to the damages analysis in response to other requests. The production of all minutes and notes that reference MTS regardless of subject matter and regardless of time would unduly burden Hysitron without advancing the case.

The court should refuse to compel Hysitron to produce documents other than those it has already agreed to produce in response to Request No. 60.

## VI. DOCUMENTS RELATING TO HYSITRON'S DEFENSE AGAINST MTS' MOTION TO STAY ARE NOT RELEVANT TO THE CLAIMS AND DEFENSES AT ISSUE IN THIS LITIGATION.

Nowhere is MTS' motion more misguided than with respect to Request Nos. 95-98, which seek information concerning Hysitron's opposition to MTS' motion to stay. MTS seemingly asks the Court to reconsider its well reasoned decision that a stay was not appropriate in this case. That issue has been finally disposed of, however, and discovery concerning that motion would serve no legitimate purpose. If MTS wanted to challenge the Court's ruling it should have filed a request for reconsideration or appealed the decision to the District Court. If MTS felt discovery on the issues raised in Mr. Wyrobek's declaration was necessary it should have moved the Court to permit it such discovery. It chose not to do either of these things, and its belated attack on this motion is not well taken.

MTS concedes, as it must, that discovery is limited to information related to the claims and defenses pled by the parties. (Docket Entry No. 18.) The only basis on which

MTS even tries to relate the requested information to the parties' claims and defenses is its argument that the requested information is relevant to the reasonable royalty and lost profits analysis, again, a basis MTS never offered during the parties' meet and confers on the issue.

As already discussed, Hysitron has agreed to produce documents sufficient to enable MTS to perform this analysis. More importantly, however, the documents sought by MTS in Request Nos. 95-98 relate to the financial condition of Hysitron generally, not to its profitability on the accused products or the market for those products. Such generalized financial information is irrelevant to the lost profits and reasonable royalty[3] analyses.

## **CONCLUSION**

Hysitron has been more than reasonable in its discovery positions, yet MTS moves the Court to compel the production of additional information that bears no relevance to the claims and defenses pled by the parties. MTS should not be allowed to harass Hysitron in this manner and the Court should deny MTS' motion in its entirety.

---

[3] These requests are also overbroad to the extent they do not focus on conditions in 2002, the time MTS began infringing Hysitron's patents.

Dated: November 7, 2007                MERCHANT & GOULD, P.C.


                                       s/Todd S. Werner
                                       Allen W. Hinderaker, #45287
                                       Todd S. Werner, #033019X
                                       3200 IDS Center
                                       80 South Eighth Street
                                       Minneapolis, MN 55402

                                       *Counsel for Plaintiff Hysitron Incorporated*