UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| HYSITRON INCORPORATED,<br>a Minnesota corporation, | ) | Civil No. 07-cv-01533 (ADM/AJB) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MTS SYSTEMS CORPORATION,<br>a Minnesota corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Dockets.Justia.com

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 4

    A.    MTS and Hysitron's Market and Consumers ..................................... 4

    B.    Internet Marketing and "hysitron" as a Keyword ............................ 8

LEGAL STANDARD ....................................................................................... 11

ARGUMENT ..................................................................................................... 12

  **I.**    **MTS'S SPONSORED LINK ADVERTISEMENT WAS NOT A "USE" IN COMMERCE UNDER THE LANHAM ACT ..................... 13**

  **II.**   **SUMMARY JUDGMENT IS APPROPRIATE BECAUSE THE UNDISPUTED FACTS SHOW THAT MTS'S SPONSORED LINK ADVERTISEMET DID NOT CAUSE, AND WAS NOT LIKELY TO HAVE CAUSED, ANY CONFUSION. ............................ 21**

    A.    Because the Undisputed Facts Demonstrate That MTS's Sponsored Link Advertising Was Not Substantially Likely to Have Caused Confusion to an Appreciable Number of Consumers, Summary Judgment Is Appropriate. ............................ 23

        1.    Degree of Purchaser Care ....................................................... 24
        2.    Strength of Hysitron's Mark ................................................... 25
        3.    Similarity Between the Marks .................................................. 26
        4.    Degree of Competition ............................................................ 27
        5.    Intent to "Pass Off" ................................................................ 28
        6.    Actual Confusion .................................................................... 29

    B.    Because the Undisputed Facts Demonstrate That There Was Not Likely to Have Been Initial Interest Confusion, Summary Judgment in MTS's Favor Is Appropriate. ...................................... 31

  **III.**  **SUMMARY JUDGMENT IS APPROPRIATE BECAUSE HYSITRON CANNOT DEMONSTRATE ANY ACTUAL OR POTENTIAL HARM ENTITLING IT TO A REMEDY. ................... 34**

A.      Hysitron Is Not Entitled to Injunctive Relief Because MTS Has Discontinued the Challenged Advertising. ................................35

      1.     Irreparable Harm ....................................................36
      2.     Balance of Harm .....................................................38
      3.     Public Interest..........................................................38
      4.     Success on the Merits.............................................39

B.      Hysitron Is Not Entitled to Monetary Damages Because It Has Not Shown and Cannot Show Actual Confusion......................40

CONCLUSION ...............................................................................................41

Defendant MTS Systems Corporation ("MTS") respectfully submits this Memorandum of Law in Support of its Motion for Partial Summary Judgment on Plaintiff Hysitron Incorporated's ("Hysitron") trademark infringement and unfair competition claims under 15 U.S.C. § 1125(a) and related Minnesota statutory and common law claims.

## INTRODUCTION

This lawsuit is, at base, a patent case. However, Hysitron has appended to its patent complaint a series of trademark-related claims that needlessly multiply the litigation, and are, in fact, much ado about nothing. Hysitron has essentially acknowledged that the conduct about which it complains, which occurred in the past and is not occurring now, did not cause any actual confusion about the source, origin, or affiliation of MTS's goods. Hysitron admits that it is not entitled to recover any damages. Nonetheless, Hysitron asks this Court to enjoin conduct which is neither presently occurring nor will occur in the future, and which, when it did occur, did not cause any actual confusion about the source, origin, or affiliation of MTS's goods. Hysitron asks this Court to engage in what is ultimately an academic exercise: to determine whether MTS's now discontinued competitive marketing strategy, which did not in fact cause any actual confusion, nonetheless would have in the past been likely to cause confusion to an appreciable number of consumers, and whether it is necessary or even appropriate for this Court to enjoin conduct that is not presently occurring and is not threatened to occur in the future. Having never sought an injunction when the alleged

infringing activity was taking place, Hysitron now vociferously claims that it is "entitled" to persist in this meritless litigation solely in order to recover its attorneys' fees.

Hysitron's trademark claims are based on the allegation that MTS's purchase of the keyword "hysitron" from certain search engines, such as Google, caused confusion as to the source of MTS's products, and therefore, infringed Hysitron's mark. When a web user performed an Internet search with the keyword "hysitron," the keyword program caused a Sponsored Link advertisement for MTS's website to appear on the same page as the list of websites produced by the search engine. As a matter of law, MTS's former Sponsored Link advertisement did not infringe upon Hystron's mark because MTS's advertisement did not display or reference the Hysitron mark in any way, and therefore did not "use" the mark as contemplated under the Lanham Act.[1] Further, even if MTS's former Sponsored Link advertisement could have been considered a "use" of Hysitron's mark under the Act, Hysitron has adduced no evidence from which a reasonable juror could conclude that that MTS's now-discontinued Sponsored Link advertisement would likely have caused an appreciable number of consumers confusion about the source of MTS's products. To the contrary, under the undisputed facts and circumstances present in this case, it is clear that Hysitron and MTS's sophisticated, knowledgeable customers

---

[1] Because the analysis is the same under the Lanham Act, Minnesota statutory law and the common law, the claims are addressed together under federal trademark analysis. *See infra* n.4.

were not actually confused by the Sponsored Link advertisement, and certainly cannot be said to likely have been confused by the ad when it ran.

The display of competitors' advertisements on the same search-result page does not violate the Lanham Act; rather, it affords consumers choices and fosters competition in the market. Trademark law has long recognized the legitimacy of just this sort of competitive activity. To hold that employing a keyword, which is invisible to consumers, to trigger a Sponsored Link advertisement is per se trademark infringement would extend trademark law down a slippery anti-competitive slope.

Finally, because MTS has discontinued its Sponsored Link advertising and has offered to enter a undertaking agreeing not to engage in this mode of advertising in the future, Hysitron cannot show the threat of irreparable harm that is a necessary prerequisite for injunctive relief. And because there is no evidence of actual confusion, Hysitron has not suffered any monetary damages from MTS's alleged infringement. Essentially, Hysitron asks this Court to look back in time and muse about whether MTS's now discontinued activity "would have been likely to have been confusing" to the parties' unique and sophisticated consumers. Hysitron makes this claim in the absence of any evidence whatsoever that any consumer was, in fact, actually confused. Because there is no past or future relief that can be or ought to be afforded to Hysitron on these claims, further litigation is a fruitless venture. Therefore, this Court should summarily dispose of these claims.

## BACKGROUND

### A.     MTS and Hysitron's Market and Consumers

Hysitron and MTS each design, manufacture and market nanomechanical test instruments.  (Compl. at ¶ 18.)  These highly sophisticated research instruments are purchased by university, industry and government research facilities for very specialized nano research and development projects.  (Declaration of Margaret Johns ("Johns Decl.") ¶¶ 4-5.)[2]  Both Hysitron and MTS have established reputations and are well-known in the narrow field of nanomechanical research.  (*Id*. ¶ 3.)

This lawsuit focuses on one such nanomechanical test instrument—MTS's Nano Vision™ product—a nano indentation device with imaging capabilities which tests the surface properties of a sample at the atomic level and which also generates an atomic level 3-D image of the sample surface.  (Johns Decl. Ex. 1.)  This advanced research device is used to test and ascertain the properties of materials at micro and nano-scale levels and enable the user to indent, i.e., probe, the atomic surface of the test sample to determine its characteristics, and also generate a 3-D map of the sample surface where the indentation was made.  (*Id*.)  The Nano Vision™ instrument allows the user to acquire accurate mechanical data about test materials at the submicron, i.e., atomic, level. (*Id*.)

These highly advanced instruments are not consumer products and they cannot be purchased over the Internet—either through an Internet transaction or indirectly.  (*Id*. ¶ 4;

---

[2]     Filed under seal.

Affidavit of David P. Pearson ("Pearson Aff.") Ex. A (Pl.'s Resp. to Def.'s First Set of Discovery Reqs. ("Adm. Nos.") 27-30.)[3]  While an Internet search may lead a customer to links to MTS's or Hysitron's websites, the expensive and sophisticated nanomechanical testing equipment which MTS and Hysitron manufacture is not sold over the Internet by a "click" on the "purchase" button.  (Johns Decl. ¶ 4; Pearson Aff. Ex. A, Adm. Nos. 27-30.)  Purchase decisions are not made during an initial Internet search; rather, the search may be merely a starting point for further investigation regarding the features, cost and other attributes of these devices.  (Johns Decl. ¶ 4; Pearson Aff. Ex. A, Adm. No. 37.)  The sophisticated and knowledgeable institutional buyers of nanotechnology conduct extensive due diligence to confirm that the testing device is suitable for their particular research before making a purchase decision.  (*Id*. ¶¶ 4-6; Pearson Aff. Ex. A, Adm. Nos. 35-36.)

The sales cycle for the Nano Vision™ device is at least six months long and is often over a year in length.  (Johns Decl. ¶¶ 6-7.)  One reason for this is the prospective purchaser, whether it be a university or government research lab, typically has particular research uses in mind for the device, and thus they take considerable care in selecting the appropriate test device for their needs.  (Johns Decl. ¶ 6.)  Potential customers often issue requests for proposals ("RFP") soliciting bids from MTS and its competitors for a device which conforms to the customer's particular specifications.  (Johns Decl. ¶ 7; Pearson

---

[3]    Filed under seal.

Aff. Ex. A (Pl.'s Resp. to Def.'s First Set of Discovery Reqs. ("Interr. No.") 18.) Through the RFP or other lengthy consultative process, MTS and the potential customer engage in a substantial amount of direct communication to determine the particular specifications the Nano Vision™ product should have to meet the customer's research needs. (Johns Decl. ¶¶ 7-9.) Another reason for the lengthy sales process is a Nano Vision™ instrument costs at least tens of thousands, and often hundreds of thousands, of dollars. (*Id*. ¶ 6; Pearson Aff. Ex. A, Adm. No. 38.) Hence, prospective purchasers engage in a lengthy due diligence process before buying one of these products. (Johns Decl. ¶ 6.) This process involves substantial, direct contact between the customer and MTS over many months or years. (*Id*. ¶ 7.)

The purchasers of these nanomechanical instruments are well-educated, knowledgeable about nanomechanical test devices, and require substantial amounts of information from the manufacturer before making a purchase decision. (*Id*. ¶¶ 4-10; Pearson Aff. Ex. A, Adm. Nos. 35-36) The individuals making a decision to purchase a Nano Vision™ device typically have an advanced degree in engineering and most often they are already familiar with both Hysitron and MTS, as well as the products which they manufacture. (Johns Decl. ¶ 5.) Nevertheless, MTS provides potential customers with substantial amounts of information about these products during the sales process. (*Id*. ¶¶ 6-10.) In fact, MTS always provides product literature about its Nano Vision™ product to the potential customer before the sale is made. (*Id*. ¶ 3.) MTS's product

information about the Nano Vision™ product contains MTS's name and logo and very clearly identifies MTS as the manufacturer of the device. (*Id.* Ex. 1.) Potential purchasers thus become well-informed about the source (manufacturer) of the product through substantial direct contact with MTS and through the receipt of MTS's product information and product quote. (*Id.* ¶¶ 3-10 and Exs. 1, 2.)

When MTS receives any inquiry about the possible purchase of its Nano Vision™ product, MTS "qualifies" the customer, i.e., it determines who the customer is, its intended use of the Nano Vision™ device, and how the product will meet the customer's objectives. (*Id.* ¶ 10.) After preliminary information is exchanged, a MTS sales representative meets face-to-face with the customer to discuss the purchaser's specific product needs and specifications and the ability of the MTS instrument to meet those needs. (*Id.*) MTS often provides the customer with samples of the imaging and test capabilities of its product, and in about 50% of the sales there is an actual demonstration of the MTS product for the customer. (*Id.*) Thus, the sales process involves significant, direct contact between the customer and MTS sales and technical staff as the precise features and capabilities of the product are worked out. (*Id.* ¶¶ 3-10 and Exs. 1, 2.) By the time the purchase decision is made, purchasers of the Nano Vision™ are fully informed about the identity of the manufacturer. (*Id.*)

At times, MTS knows with whom it is competing on a particular RFP or other request. (*Id.* ¶ 11.) In the sales process, MTS and Hysitron are both trying to inform and

persuade the customer about the benefits of each manufacturer's respective product. Far from being confused, in this market, given the nature of the product, the purchasers and the sales process, customers are well-informed about MTS and Hysitron and the products they make. (*Id*. ¶¶ 3-11.)

**B. Internet Marketing and "hysitron" as a Keyword**

Internet[4] search engines enable users to locate websites by keying in terms ("keywords") and performing searches on the search-engine database. (Compl. ¶ 25.) One example is the Google "AdWords" program.[5] (*Id*. ¶ 28.) In response to a keyword search, Google and other search engine providers produce both organic- and sponsored-

---

[4]    The Internet or "web" is "a global network of millions of interconnected computers" and a user can access "information that is stored on much of the Internet in repositories called 'servers'." *1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400, 403 (2d Cir. 2005). A user "generally connects to the Internet using an Internet service provider ('ISP')," which allows the user's computer to communicate with the Internet, and the user may then "browse" the Internet using a software program called an Internet browser such as, for example, Microsoft Explorer. *Id*. Users utilize "search engines" to find information by typing one or more keywords, which the search engine uses to create a list of websites and webpages that contain those keywords. *Id*. at 303-04.

[5]    Google operates a widely-used Internet search engine through which consumers can search for, among other things, websites offering information about products and services. Google's "AdWords" service allows customers to arrange for their advertisements to appear on Google's search results page in response to a user's search query. For example, a user of Google's website who enters a search for "books" might receive search results that include advertisements for booksellers. Google's customers may select certain search terms that, if entered by a user, will return search results that include a separate section titled "Sponsored Links." The "Sponsored Links" section identifies and provides a link to the customer's website, and presents a limited amount of advertising text. For additional descriptions of Google and its AdWords Program *see Int'l Profit Assocs., Inc. v. Paisola*, 461 F. Supp. 2d 672, 676 (N.D. Ill. 2006), and *Government Employees Ins. Co ("GEICO") v. Google, Inc.*, No. 1:04CV507, 2005 WL 1903128, at *2 (E.D. Va. Aug. 8, 2005).

result lists of websites. (*Id*. ¶ 26.) Organic-result lists match the user's keyword to data on a particular website. (*Id*. ¶ 26.) Sponsored-result lists match keywords purchased by advertisers to data on a particular website. (*Id*. ¶ 27.) Search engines such as Google use sponsored-result lists as a way to generate revenue. (*Id*.) When a user's keyword matches a keyword purchased by an advertiser, a clearly titled "Sponsored Link" advertisement may appear on the search-result page. (*Id*. ¶ 29.) This "Sponsored Link" section appears on the same page, but separate from the organic-result list generated by the search engine, and it is generally shaded and to the side or above the organic-result list.

Hysitron does not own a federal or state trademark registration for the mark Hysitron for use with any goods and services. (Pearson Aff. Ex. A, Adm. Nos. 4, 6.) Approximately two years ago, MTS obtained the keyword "hysitron" from Google, which triggered MTS's Sponsored Link advertisement to appear on the search-result page below the label "Sponsored Link" when a user typed the term "hysitron" into the search engine. (Compl. ¶¶ 32, 34.) Importantly, a search using the keyword "hysitron" does not simply take a user directly to Hysitron's website or a website authorized by Hysitron. Rather, it produces an organic search-result list that may include web pages administered by Hysitron, discussing Hysitron, or perhaps even criticizing Hysitron, or any web page with the word "Hysitron" in its text, such as an article or "blog."

During the period in which MTS utilized a Sponsored Link with the keyword "hysitron," MTS's Sponsored Link advertisement did not incorporate or display Hysitron's mark in its title, heading, text, or any other portion of the advertisement seen by the user.  (Johns Decl. ¶ 12; Pearson Aff. Ex. B (Pl.'s Responses to Def.'s 2d Set of Discovery Reqs.), Adm. Nos. 39-46.)   Thus, when a user performed a search under the keyword "hysitron," she or he would be presented with an organic-list of potentially relevant websites and a separate Sponsored Link advertisement of MTS's products that did not display the word "hysitron" in any manner whatsoever.

Earlier this year, MTS offered in good faith to enter an undertaking agreeing not to continue its "hysitron" keyword-triggered Sponsored Link advertising in the future. Although no formal undertaking was entered between the parties, MTS has discontinued the program and has no plans to resume the "hysitron" keyword Sponsored Link advertising in the future.  (Johns Decl. ¶ 12.)  Importantly, Hysitron has not presented any evidence tending to show that any consumers were actually confused as to the source of MTS's products by the Sponsored Link advertisement when it was in place, nor has Hysitron presented any evidence that it lost any sales as a result of the advertisement. (Pearson Aff. Ex. B (Pl.'s Responses to Def.'s 2d Set of Discovery Reqs.), Interr. No. 21.)  In fact, Hysitron has acknowledged that it is not seeking monetary damages in connection with its trademark infringement claims, implicitly recognizing there has been no actual confusion in this case.  (*Id*. Ex. B, Interr. No. 20.)  Like Hysitron, MTS is not

aware of any actual confusion in the marketplace, nor any likelihood of confusion. (Johns Decl. ¶¶ 11-12.)

## LEGAL STANDARD

Summary judgment is appropriate in the absence of genuinely disputed material facts. Fed. R. Civ. P. 56(c) (summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are 'designed to secure the just, speedy and inexpensive determination of every action.'" *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *See, e.g.*, *Anderson*, 477 U.S. at 256; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995); *Ring v. Sears, Roebuck & Co.*, 250 F. Supp. 2d 1130, 1138 (D. Minn. 2003).

**ARGUMENT**

Hysitron asserts five counts of federal and state trademark infringement claims.[6] To prove trademark infringement under Section 43(a)[7] of the Lanham Act, 15 U.S.C. § 1125(a)(1), a moving party must show that "(1) it has a valid mark that is entitled to protection; and (2) the accused infringer is using the mark without consent, in commerce, so that it creates a likelihood of confusion." *Feed Mgmt. Sys. Inc. v. Brill*, 518 F. Supp. 2d 1094, 1097 (D. Minn. 2007) (*citing 1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005)); *see also Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 759 (8th Cir. 2005) (citing same elements). To constitute infringement, the use must be likely to cause confusion to an appreciable number of consumers. *Gateway, Inc. v. Companion Prods.*, 384 F.3d 503, 509 (8th Cir. 2004).

As a matter of law, MTS's Sponsored Link advertisement, which did not display or visibly reference Hysitron's mark in any way, did not constitute a trademark "use" as

---

[6] Hysitron asserts claims for federal unfair competition under 15 U.S.C. § 1125(a), deceptive trade practices under Minn. Stat. § 325D.44, unlawful trade practices under Minn. Stat. § 325D.15, common law trademark infringement, and common law unfair competition. (*See* Compl.) Because Minnesota statutory and common law trademark and trade practices claims require the same analysis as claims under the Lanham Act, the claims will be discussed together under Defendant's federal trademark analysis. *See Daimler Chrysler AG v. Bloom*, 315 F.3d 932, 936 n.3 (8th Cir. 2003) (citing *DeRosier v. 5931 Business Trust*, 870 F. Supp. 941, 948 n.8 (D. Minn. 1994)) ("[T]he Plaintiff's infringement claim is premised upon the common law; the Lanham Act; and the Minnesota Deceptive Trade Practices Act. Despite their different origins, the elements of each of these actions mirror each other and, in practical effect, tend to coalesce."); *Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 68 F. Supp. 2d 1064, 1069 (D. Minn. 1999).

[7] Because Hysitron does not have a federal registration for its mark, Section 32 of the Lanham Act is inapplicable.

contemplated by the Lanham Act.  Alternatively, even if MTS's Sponsored Link advertisement could have been considered "use" of the mark, there are no genuinely disputed material facts from which a reasonable juror could conclude that an appreciable number of Hysitron's and MTS's sophisticated customers would likely have been confused by the advertisement.  And because MTS has discontinued the advertising and Hysitron has no evidence of damages, neither money damages nor injunctive relief are necessary or appropriate.  For each of these reasons, summary judgment on Hysitron's trademark infringement claims is appropriate.

## I. MTS'S SPONSORED LINK ADVERTISEMENT WAS NOT A "USE" IN COMMERCE UNDER THE LANHAM ACT.

To have violated the Lanham Act, MTS must have used Hysitron's mark or a colorable imitation thereof, in commerce.  *See Daimlerchrysler Ag v. Bloom*, 315 F.3d 932, 939 (8th Cir. 2003).  Not all trademark "uses" are actionable; rather, only uses contemplated under the Lanham Act give rise to an infringement action.

"Use in commerce" is defined in the Act as: the bona fide use of a mark in the ordinary course of trade,

> (1) on goods when—
>     (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>     (B) the goods are sold or transported in commerce, and
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce[.]

15 U.S.C. § 1127. To be clear, MTS has not, at any time, placed Hysitron's mark on MTS' goods, containers, displays, tags, labels, or documents, or on its Sponsored Link advertisements.

Trademarks "identify and distinguish . . . goods . . . from those manufactured or sold by others and . . . indicate the source of the goods." *Id.* One purpose of trademarks is to foster fair competition. As stated in the legislative history of the Lanham Act: "Trade-marks, indeed, are the essence of competition, because they make possible a choice between competing articles by enabling the buyer to distinguish one from the other." *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1215 (8th Cir. 1976) (citing S. Rep. No. 1333 (1946), *as reprinted in* 1946 U.S.C.C.A.N. 1275). MTS has not used Hysitron's trademark in the manner contemplated by the Lanham Act because it has not placed the mark on its goods or sought to pass them off as emanating from or authorized by Hysitron. In fact, MTS has not reproduced or displayed Hysitron's trademark at all. To the contrary, the Sponsored Link and all MTS's product literature prominently displayed MTS's name and trademark.

Although the Eighth Circuit has not yet considered whether keyword-triggered Sponsored Link advertising could constitute an infringing use of a competitor's trademark, many courts have held this practice permissible where, as here, the trademark is not used as a source-identifying designation in connection with the sale of good or services. *See Merck & Co v. MediPlan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 406

(S.D.N.Y. 2006); *Rescuecom Corp. v. Google, Inc.*, 456 F. Supp. 2d 393, 403 (N.D.N.Y. 2006); *c.f. Edina Realty v. The MLSOnline.com*, 04-4371JRT/FLN, 2006 WL 737064 (D. Minn. Mar. 20, 2006). It is precisely this distinction that matters: whether or not the alleged infringer actually places the mark on any goods or services in order to pass them off as the competitor's. *See, e.g.*, *1-800 Contacts*, 414 F.3d at 408. As Hysitron's own counsel indicated in an article on this topic, it is precisely the existence these differing facts which separate legitimate and flawed claims of infringing "use." As he noted, "the facts of the particular case have a significant impact on whether a use is infringing or not." Ernest W. Grumbles, William D. Schultz, *Trademarks on the Internet*, *in The IP Book*, 227 (4th ed. 2006).

The case law bears this out. For example, in *Merck*, plaintiff Merck, owner of the mark Zocor, sued a number of Canadian-based Internet pharmacies for purchasing the keyword "zocor" to trigger Sponsored Link advertising. 425 F. Supp. 2d at 406. The court held that the purchase of these keywords, and the advertisements they triggered, did not constitute "use" under the Lanham Act because the ads did not reproduce or display the competitor's trademark. *Id.* at 415. The court reasoned that the Zocor mark was "used only in the sense that a computer user's search of the keyword 'Zocor' will trigger the display of Sponsored Links to defendants' websites. This internal use is not use of the mark in a trademark sense . . . [as it is] 'analogous to a[n] individual's private thoughts about a trademark.'" *Id.* (citation omitted). Under these circumstances, "there

is nothing improper with defendants' purchase of Sponsored Links to their websites from searches of the keyword 'Zocor.'" *Id*. at 416.

Similarly, in *Rescuecom*, plaintiff Rescuecom Corp alleged that Google sold the keyword "rescuecom" to its competitors so that when a user searched with the keyword rescucom, Google's search results included the competitor's Sponsored Link advertisement. 456 F. Supp. 2d at 403. The court found no Lanham Act "use" because there was "no allegation that defendant places the plaintiff's trademark on any goods, containers, displays, or advertisements, or that its internal use is *visible to the public*." *Id*. (emphasis added.)

These are but a two examples of the thoroughly considered, well-reasoned decisions holding that a keyword-triggering Sponsored Link advertisement which does not display the competitor's trademark does not constitute Lanham Act "use." *See also Site Pro-1, Inc. v. Better Metal, L.L.C.*, 506 F. Supp. 2d 123 (E.D.N.Y. 2007) (dismissing complaint because defendant's actions did not constitute trademark "use" when defendant purchased a sponsored search causing defendant's site to be included among listings when some combination of "1" "pro" and "site" were keywords); *FragranceNet.com, Inc. v. FragrenceX.com, Inc.*, 493 F. Supp. 2d 545 (E.D.N.Y. 2007) (refusing to permit plaintiff to amend complaint to assert trademark infringement claim when defendant accused of using plaintiff's trademark as keyword to trigger Sponsored Link advertisements "based on the sound reasoning of *Merck, Rescuecom and SitePro-1*");

*S&L Vitamins Inc. v. Australian Gold Inc.*, 521 F. Supp. 2d 188 (E.D.N.Y. 2007)
(granting partial summary judgment holding S&L's purchase of Australian Gold's
trademark as a keyword trigger did not constitute Lanham Act "use" of the mark even
though mark *did appear in the text* of keyword-triggered ads); *Nautilus Grp., Inc. v. Icon
Health & Fitness, Inc.*, No. C02-2420RSM, 2006 WL 3761367 (W.D. Wash. Dec. 21,
2006) (granting defendant's motion for summary judgment when plaintiff failed to
proffer evidence that defendant actually "used" trademark in dilution action when
defendant owner of Crossbow purchased keyword "Bowflex information" so it would
appear as sponsored link titled "Compare Crossbow to Bowflex"); *c.f. Hamzik v. Zale
Corp.*, No. 3:06-cv-1300, 2007 WL 1174863 at *3 (N.D.N.Y. April 19, 2007) (holding
that, unlike *Rescucom* and *Merk & Co.*, the facts demonstrated that plaintiff's trademark
*did* appear on displays associated with the goods and therefore purchase of trademarked
keyword "dating rings" from various search engines constituted "use").

In the analogous context of "pop-up" ads,[8] plaintiffs have argued that defendants
have infringed their trademarks by creating the false impression that the competing ads
were created in cooperation with plaintiffs. *See, e.g.*, *1-800 Contacts*, 414 F.3d at 400.
Courts have rejected this argument, finding no "use" in the manner prohibited by the

---

[8]     "Pop-up" advertisements respond to an Internet user's "in-the-moment" activities
by generating an advertisement window relevant to that particular activity. *See 1-800
Contacts, Inc.*, 414 F.3d at 405.  To deliver contextually relevant advertising to users,
proprietary software downloaded from the Internet employs an internal directory of
search terms and keywords that trigger the advertising. *Id.*

Lanham Act where the ad did not display the competitor's trademark. *See U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723, 729 (E.D. Va. 2003) (finding no Lanham Act use because pop-up ad was separate and distinct from plaintiff's website and Internet users were not hindered from accessing plaintiff's website); *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 761 (E.D. Mich. 2003) (deeming use "legitimate comparative advertising," because "[p]laintiff's marks are neither displayed or appear to be displayed on WhenU's windows, and the fact that WhenU advertisements appear on a computer screen at the same time plaintiffs' web pages are visible in a separate window does not constitute a use in commerce of plaintiff's mark.").

In *1-800 Contacts*, the Second Circuit held that the challenged conduct did not constitute Lanham Act use because the pop-up ads did not display the plaintiff's trademark. The court also concluded that the reproduction of a website address that was similar, but not identical, to the plaintiff's trademark, on an internal computer directory that is inaccessible to the Internet user, is a use that is "analogous to an individual's private thoughts about a trademark. Such conduct does not violate the Lanham Act." *1-800 Contacts*, 414 F.3d at 403.

As noted above, the Eighth Circuit has not yet spoken on this issue, but in an unpublished decision that is factually distinguishable from the instant case, Judge Tunheim of this District found that a keyword-triggering Sponsored Link advertisement constituted "use" under the Lanham Act. *See Edina Realty*, 2006 WL 737064. In *Edina*

*Realty*, Defendant MLSOnline purchased the keyword "Edina Realty" from Google and, as a result, MLSOnline's keyword-triggered Sponsored Link advertisement appeared together with the organic-results list in response to a consumer's search for "Edina Realty." 2006 WL 737064 at *1. Based on the facts alleged in that case, the court stated, "While not a conventional 'use in commerce,' defendant nevertheless uses the Edina Mark commercially." *Id*.

While the facts appear similar on the surface, there is a critical distinction between *Edina Realty* and this case. There, MLSOnline's Sponsored Link advertisement visibly and prominently displayed the "Edina Realty" mark *in the text of the Sponsored Link advertisement to the end user*. *Id*. For example, when a user searched using the keyword "Edina Realty," MLSOnline's Sponsored link advertisement appeared with a headline such as "Edina Realty™ listings—MLS Home Search," or "Find Edina Realty™ and Twin Cities MN MLS listings." *Id*. Thus, Judge Tunheim was not called upon determine whether a keyword-triggered Sponsored Link advertisement constituted Lanham Act use when there is absolutely no display of, or reference to, the competitor's mark in the advertisement.

Here, as in *1-800 Contacts*, *Merck*, *Rescuecom*, *FragranceNet.com*, and the other cases cited above, MTS's advertisement *did not* display or refer to Hysitron's mark, had no effect on the appearance of Hysitron's website or link, did not misdirect customers away from Hysitron's website, and in no way limited or altered the breadth of the

organic-results of a search based on Hysitron's mark. MTS's advertisement appeared separate from the organic search results, in a shaded box clearly identified as "Sponsored Links" above or next to the search results—which clearly represented an advertisement. (Compl. ¶¶ 29, 32, 34). This marketing approach can be analogized to permissible product placement marketing in retail stores, which may capitalize on a competitor's name recognition.[9] *See 1-800 Contacts*, 414 F.3d at 408 ("this [] marketing strategy [informs] users who have sought out a specific trademarked product about available coupons, discounts, or alternative products that may be of interest to them."). In a similar vein, the Lanham Act does not prohibit a retailer from acquiring billboard space close to its competitor's billboard, or passing out advertising flyers near a competitor's place of business, or placing its newspaper or magazine advertisement adjacent to a competitor's ad.

In each of these examples, the competitor's trademark was not being "used" as contemplated under the Act because it was not affixed to the goods, services, or

---

[9]     MTS's marketing strategy is analogous to Crest toothpaste purchasing retail-shelf placement next to Colgate toothpaste in a grocery store. The search engine functions as would a grocery store employee directing a customer to the toothpaste aisle when asked where Colgate toothpaste is located. Crest is aware that a few people may go to the toothpaste aisle looking for Colgate, but this is, in fact, Crest's marketing strategy: Crest has a right to target prospective toothpaste buyers, present all purchasing options, and, on a side-by-side comparison, provide a competitive choice. In acquiring shelf space next to Colgate, Crest has not "used" Colgate's trademark as contemplated under the Lanham Act—to deceive customers into thinking Crest is made or approved by Colgate—rather, it has marketed its product competitively through product placement. This does not constitute trademark infringement as would, say, putting the Crest toothpaste bins labeled "Colgate."

advertising. Trademark law has long recognized this sort of competitive activity as legitimate, and the same principles have been applied to the new and rapidly evolving market of the internet. The display of a competitor's advertisements on the same search-result page does not violate trademark laws—it gives consumers information and choices, and fosters competition. *See Toro Co. v. R & R Prods. Co.*, 787 F.2d 1208 at 1216 (8th Cir. 1986) ("[T]he law does not foreclose a competitor from zeroing in on a profitable market segment and offering an alternative product."). Because MTS's keyword-triggered Sponsored Link advertisement does not constitute "use" under the Lanham Act, MTS has not infringed on Hysitron's trademark. Summary judgment is therefore appropriate on Hysitron's trademark claims.

## II. SUMMARY JUDGMENT IS APPROPRIATE BECAUSE THE UNDISPUTED FACTS SHOW THAT MTS'S SPONSORED LINK ADVERTISEMET DID NOT CAUSE, AND WAS NOT LIKELY TO HAVE CAUSED, ANY CONFUSION.

Even if MTS's Sponsored Link advertising could be considered "use" under the Lanham Act, to succeed on a claim of trademark infringement, Hysitron must also demonstrate that such "use" would "likely cause confusion among an appreciable number of consumers." *Gateway, Inc.*, 384 F.3d at 509; *see also Gov't Employees Ins. Co. ("GEICO") v. Google, Inc.*, No. 1:04CV507, 2005 WL 1903128 at *3 (E.D. Va. Aug. 8, 2005) (a finding of use "does not, without more, establish that defendant has violated or continues to violate the Lanham Act"). The applicable standard is one of "substantial likelihood" of confusion, *Children's Factory v. Benee's Toys*, 160 F.3d 489, 494 (8th Cir.

1998), to an "appreciable number" of consumers. *Gateway, Inc.*, 384 F.3d at 509; *see also Toro Co.*, 787 F.2d at 1216 ("[i]f only a few instances [of confusion] exist over a long period of time, then this would weigh in favor of a finding of no likelihood of confusion").

A "mark holder is generally not entitled to relief unless the defendant advertises or otherwise promotes [the actual mark] thereby causing the public to see the protected mark and associate the infringer's goods or services with those of the mark holder." *Daimlerchrysler AG*, 315 F.3d at 939; *c.f. Playboy Enterprises, Inc. v. Netscape Comms. Corp.*, 354 F.3d 1020, 1025 (9th Cir. 2004) (repeatedly emphasizing that if advertisement either "clearly identified [the] source" or "overtly compared" products to those advertised in the banner ad, "no confusion would occur").

Courts have historically applied a six-factor test to determine whether a likelihood of confusion arises from the alleged infringing conduct. *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1089 (8th Cir. 1980). More recently, courts have discussed the need to apply a somewhat different analysis in the Internet context. *See, e.g. GEICO*, 2005 WL 1903128 at *4. In some such cases, courts have considered whether the allegedly infringing use can be said to cause "initial interest confusion." *Id*. Generally, Initial interest confusion arises immediately upon exposure to the infringing use, rather than at a future point, such as the point of purchase.

Here Hysitron asks the Court to determine whether MTS's former Sponsored Link advertising program might have been likely to have caused confusion when it was in place, even in the absence of any evidence of actual confusion. Under either the traditional six-factor test or the initial interest confusion standard, Hysitron has failed to show and cannot show that the Sponsored Link advertising would have been substantially likely to cause an appreciable number of consumers confusion about the source of MTS's goods.

**A.    Because the Undisputed Facts Demonstrate That MTS's Sponsored Link Advertising Was Not Substantially Likely to Have Caused Confusion to an Appreciable Number of Consumers, Summary Judgment Is Appropriate.**

Applying the traditional six-factor test to the facts and circumstances in this record clearly demonstrates that consumers were not likely to have been confused by MTS's Sponsored Link advertisement. Under the six-factor test, courts consider: (1) whether the degree of purchaser care can eliminate any likelihood of confusion which would otherwise exist; (2) the strength of the owner's mark; (3) the similarity between the owner's mark and the alleged infringer's mark; (4) the degree to which the products compete with each other; (5) the alleged infringer's intent to pass off its goods as those of the trademark owner; and (6) incidents of actual confusion. *SquirtCo*, 628 F.2d at 1089. The test does not operate in a mathematically precise formula; rather, at the summary judgment stage, the factors serve as a guide to determine whether a reasonable juror could find a likelihood of confusion. *Duluth News-Tribune v. Mesabi Pub. Co.,* 84 F.3d

1093, 1096 (8th Cir. 1996) ("Resolution of [the likelihood of confusion] issue does not hinge on a single factor.") (quotation omitted). Accordingly, each factor is addressed in turn.

### 1. Degree of Purchaser Care

The sophistication of the consuming public or the quality of the defendant's product is always a relevant factor in assessing likelihood of confusion, and it is particularly significant here. *See, e.g.*, *Perini Corp. v. Perini Constr. Inc.*, 915 F.2d 121, 127 (4th Cir. 1990) (reversing and remanding for failure to take into consideration sophistication of professional buyers of costly construction contracts reasoning that "the sophistication and expertise of usual purchasers can preclude any likelihood of confusion"). "As a general rule, the greater the cost of the product or service, the more time and effort consumers are expected to expend when making decisions, and therefore the likelihood of confusion decreases." *Mars Musical Adv., Inc. v. Mars, Inc.*, 159 F. Supp. 2d 1146, 1153 (D. Minn. 2001).

There is no dispute that here, knowledgeable purchasers use a very high degree of care. Nanomechanical test instruments generally, and nano imaging devices at issue here in particular, are an expensive, long term investment, costing in the tens or hundreds of thousands of dollars each. (Johns Decl. ¶¶ 6-7; Pearson Aff. Ex. A, Adm. No. 37). The purchase of a nano imaging instrument is a process which takes an extended period of time; it is not an event which occurs on-line. (Johns Decl. ¶ 7.) The consumers are institutional buyers who purchase these products after completing a due diligence process

whereby they are well-informed about the features of the device they are thinking about buying.  (*Id.* ¶¶ 4-11 and Exs. 1, 2.)  The individuals who use these goods are highly educated, are often already familiar with these products, and usually have particular research projects or other uses for these devices.  (*Id.*)  The purchase process involves direct and usually face-to-face communication between the purchaser and the manufacturer, in this case MTS, and MTS provides the prospective customer with detailed product information so the customer understands the uses, capabilities and advantage of the MTS product.  (*Id.*)  This product information clearly identifies MTS as the source/manufacturer of the product.  (*Id.* Ex. 1.)  Further, in many instances, the nano research instruments are purchased in an RFP process; a context in which there could not possibly be any confusion because the company selling the product is explicitly disclosed to the customer in its response to the RFP.  (*Id.* ¶¶ 7-11; Pearson Aff. Ex. A, Adm. No. 32).  Hysitron has admitted that the consumers understand the difference between MTS and Hysitron.   (Pearson Aff. Ex. A, Adm. No. 32).  Thus, this factor weighs in favor of MTS because the type of products sold, the sophisticated, knowledgeable nature of the customers, and the level of customer involvement with these products, all indicate that customers will take substantial time and effort in their purchase decisions.  This factor alone precludes any likelihood of confusion.

### 2.    Strength of Hysitron's Mark

The Court determines the strength of a mark by classifying it as arbitrary or fanciful, suggestive, descriptive, or generic.  *Duluth News-Tribune v. Mesabi Pub. Co.,*

84 F.3d 1093, 1096 (8th Cir. 1996). Fanciful marks are, in essence, made-up words expressly coined to serve as a trademark. *See* 1 J. Thomas McCarthy, *McCarthy on Trademark and Unfair Competition* § 11.01 (2008). Hysitron's mark may be fanciful and therefore, under traditional trademark analysis, would be entitled to a broad scope of protection. But because MTS never affixed the Hysitron mark to any of MTS's goods, services, or advertising, the mark's fanciful nature has little bearing on the analysis here. The fanciful nature of Hysitron's mark and the apparent dissimilarity between "Hysitron" and "MTS" indicates no confusion was likely. The pool of companies producing nano indenture / imaging products is extremely small. Further, the pool of potential customers interested in such products is particularly knowledgeable about the companies. Hysitron and its mark are known and are readily recognizable in the market, just as MTS and its mark are well-known in this market. Hysitron and MTS are each well-known in the small universe of nano researchers who might buy these products, and Hysitron among readily distinguishable from MTS's marks and products. Since Hysitron's mark was not affixed to or displayed in connection with MTS's products, its strength would not suggest that consumers would have been confused about the source of MTS's products. Thus, this factor does not weigh in favor of a finding of a likelihood of confusion.

### 3. Similarity Between the Marks

For similar reasons, this factor also does not support a finding of likelihood of confusion. When running its Sponsored Link ad, MTS did not display Hysitron's mark. Hence, there is no possibility that it would have been confused with MTS's mark. The

mark "Hysitron" is not visually, aurally or structurally similar to the mark "MTS." (Pearson Aff. Ex. A, Adm. No. 15.) Moreover, in comparing MTS's Sponsored Link to the organic links that appeared when user searched under the keyword "hysitron," and the impression that each link would likely have had on a purchaser, the same conclusion follows—there was nothing confusing about the advertisement or its source. *See Duluth News-Tribune*, 84 F.3d at 1097 (considering similarities between impression of each trademark in its entirety and likely impression on newspaper purchasers).

This is so because the search results included organic-results links to Hysitron's website that depicted its mark, and the Sponsored Link advertisement for MTS, which displayed only MTS's mark and references to MTS—not to Hysitron. MTS's clearly titled Sponsored Link advertisement appeared on the search-result page shaded a different color, off to the right or above the organic-result list, and it did not refer to Hysitron. In fact, the link was simply titled "MTS NanoInstruments," and hence it was readily distinguishable to persons who viewed the search page. Thus, it cannot be said that Internet users were likely to have been confused by any similarity between Hysitron's and MTS's marks, and this factor does not support a finding of likelihood of confusion.

### 4. Degree of Competition

It is undisputed that both Hysitron and MTS make and sell nanomechanical test instruments. They are two of the most prominent manufacturers of nano imaging devices in the U.S., and both are well-known in their small field. (Johns Decl. ¶ 3.) It is

precisely for this reason that MTS sought to display advertisements on the same search-result page as Hysitron: so that consumers would be presented choices among competing products. This type of competitive activity has long been considered legitimate; mere proximity of goods or advertisements has never been deemed illegal. *See 1-800 Contacts*, 414 F.3d 400; *see also* Paul L. Bonewitz, *Beyond Confusion: Reexamining Trademark Law's Goals in the World of Online Advertising*, 81 St. John's L. Rev 899, 915 (2007). Again, this factor does not weigh in favor of Hysitron's trademark claim.

### 5.     Intent to "Pass Off"

Nor does the fifth factor, an intent to pass off, support a finding of likelihood of confusion. Hysitron has not presented any evidence tending to show that MTS's intended to "pass off" its product as Hysitron's. To the contrary, the record demonstrates that MTS sought to ensure that its customers would distinguish MTS and Hysitron by explicitly labeling its advertisement "MTS." (Johns Decl. ¶ 11.) MTS's Sponsored Link advertisement in no way incorporated Hysitron's trademark into its title or text, or otherwise attempted to pass the advertisement off as emanating from or authorized by Hysitron. (*Id.* ¶ 12.) MTS sought to eliminate customer confusion between the two companies and to foster competition. Hysitron's mark is fanciful, MTS's mark bears no resemblance whatsoever to Hysitron's mark, and these facts further demonstrate a lack of intent to confuse customers in this case. *See, e.g. Empi, Inc. v. Iomed, Inc.*, 923 F. Supp. 1159, 1167 (D. Minn. 1996) ("An inference of intent arises where a party, with knowledge of a competitor's trade dress, chooses a similar dress from an infinite number

of possibilities.")  It is unfathomable that MTS's conduct could have been undertaken with intent to confuse customers.  Finally, the fact that MTS clearly identifies itself to potential customers at the time of initial contact and throughout the lengthy sales cycle, renders this notion absurd.  This factor certainly favors MTS.

### 6.    Actual Confusion

The fact that Hysitron has not identified any evidence of actual confusion is critical in the Court's analysis of whether there could have been any likelihood of confusion in the past.   "[W]hen determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion." *Duluth News-Tribune*, 84 F.3d at 1099 (*quoting Life Techs., Inc. v. Gibbco Sci., Inc.*, 826 F.2d 775, 777 (8th Cir. 1987)).  The Eighth Circuit has held that a few instances of actual confusion indicate, and support, a finding of no likelihood of actual confusion.  *Toro Co.*, 787 F.2d at 1215.   With respect to evidence of likelihood of confusion, the *Toro* court noted that, "actual confusion is the best evidence of likelihood of confusion."  *Id*.; *accord*, *Maas & Waldstein Co. v. Am. Paint Corp.*, 288 F.2d 306-307 (8th Cir. 1961). Other courts agree that the lack of actual confusion is a "strong indicator" of a lack of a likelihood of confusion.  *Plus Prods. V. Plus Discount Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983); *The Nautilus Group, Inc. v. Savvier, Inc.*, 427 F. Supp. 2d 990, 997 (W.D. Wash. 2006); *Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 699 (S.D.N.Y. 1999). Moreover, at the summary judgment stage, courts consider only evidence that an "appreciable number of ordinary purchasers are likely to be so misled."  *Duluth News-*

*Tribune*, 84 F.3d at 1099 (finding that plaintiff's allegations of actual confusion failed to raise a genuine fact dispute when facts alleged were de minimis, vague and based on hearsay); *see also Astra Pharm. Prod. Inc. v. Beckman Instrus. Inc.*, 718 F.2d 1201, 1207-08 (1st Cir. 1983) (holding temporary confusion insufficient to raise genuine issue of material fact). Generally, the lack of actual confusion is fatal to a trademark infringement claim because it demonstrates the lack of any likelihood of confusion.

Here, Hysitron has not demonstrated that *any* actual confusion about the source or affiliation of MTS's products *ever* arose as a result of its Sponsored Link advertisement, let alone that an "appreciable number" of consumers were misled. In fact, Hysitron has acknowledged that it has no evidence of any actual confusion. (Pearson Aff. Exs. A and B, Interr. Nos. 15, 20.) Likewise, MTS has no knowledge of any actual confusion. (Johns Decl. ¶¶ 10-11.) MTS's advertisement was in existence for over two years, and Hysitron has had ample time to assemble evidence of actual confusion, if any was available. *See, e.g., Northland Ins. Cos.*, 115 F. Supp. 2d at 1121-22 (reasoning that website existing for over one year gave plaintiff sufficient time to gather evidence of actual confusion). Absent such evidence, this factor cannot weigh in Hysitron's favor. The absence of any actual confusion over the two-year period in which the Sponsored Link was in operation should preclude any likelihood of confusion whatsoever. Any such claim would be based solely on conjecture and must be rejected.

In sum, the six factors are either neutral or weigh in MTS's favor. Hysitron's mark is fanciful and easily distinguished from MTS's mark, the weblinks are not similar, there is no evidence of MTS's intent to "pass off" its product as Hysitron's, there is no evidence of actual confusion, and the ordinary purchasers have not and will not be confused between the two companies. Accordingly, summary judgment in favor of MTS is appropriate.

**B.      Because the Undisputed Facts Demonstrate That There Was Not Likely to Have Been Initial Interest Confusion, Summary Judgment in MTS's Favor Is Appropriate.**

Should the Court opt to apply an initial interest confusion analysis, the outcome would be the same. Notably, the Eighth Circuit has not specifically addressed the initial interest confusion doctrine to date. *Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1119 (D. Minn. 2000); *c.f. Faegre & Benson, L.L.P. v. Purdy*, 447 F. Supp. 2d 1008, 1017 (D. Minn. 2006) (finding initial interest confusion in domain name cybersquatting case). Some courts in other jurisdictions have found initial interest confusion to exist where customers were diverted away from a purchase on a particular Internet *website*—as distinguished from an Internet user simply conducting searches and browsing a variety of sites in search of information about a product. *See GEICO*, 2005 WL 1903128 at *4. This application of initial interest confusion has been described as "the distraction or diversion of a potential customer from the website he [or she] was initially seeking to another site, based on the user's belief that the second site is associated with the one [the user] originally sought." *Id*. However, the risk of confusion

in this scenario is "lessened on the [I]nternet when compared, for example, to when a billboard employs initial interest confusion to entice a customer down the wrong road because a customer can retrace his steps almost instantaneously online." *Id.* at *5.

Initial interest confusion is properly limited to those situations in which the trademark actually appears in the Internet ad. *Id.* In *GEICO*, GEICO challenged Google's sale of GEICO's mark as a keyword. 2005 WL 1903128 at *2. The court found that a likelihood of confusion would exist *only* when GEICO's trademark "appears either in the heading or text of the ad," and further found as a matter of law that no likelihood of confusion arose from Google's use of the GEICO mark as a keyword generally. *Id.* at *7; *c.f. Playboy Enterprises*, 354 F.3d at 1025 (finding likelihood of confusion under initial-interest confusion theory where banner advertisement *did not* clearly identify source with sponsor's name).

The traditional initial interest confusion analysis is largely inapplicable to the facts of this case. The moment MTS's Sponsored Link advertisement appeared, users were made aware that it was not a link to Hysitron. (Pearson Aff. Ex. B, Adm. No. 39-46). Internet users understand that a search engine produces a list of search results with varying relevance to the search term. "A search engine does not take the consumer directly to the website potentially responsive to a query for a given trademark… [and] the reasonable consumer does not accord initial credibility to a website simply because it is listed among the search engine results in a query for the trademark owner's mark." 4

McCarthy § 25:69 (citing D.M. Klein & D.C. Glazer, *Reconsidering Initial Interest Confusion on the Internet*, 93 Trademark Rptr. 1035, 1060-61 (2003)).

Here, web users could not be diverted from a purchase, nor were they directed away from a particular Internet website. Users were not diverted from a purchase because a nanomechanical-device cannot be purchased from either party's website. Users were not diverted from a website because they were looking at a *list*, which included a *link* to Hysitron's site (and others) when they saw MTS's Sponsored Link advertisement. Further, it was clear that the advertisement was not associated with Hysitron, but rather, belonged to its competitor. Thus, it could not have caused initial interest confusion because only *confusing use*, not competitive use, is infringing conduct.

As Hysitron admits, purchasers of nanotechnology are sophisticated and they know that MTS and Hysitron are direct competitors. (Pearson Aff. Ex. B, Adm. No. 39-46). Moreover, consumers cannot be misdirected from a purchase Hysitron products on the web because Hysitron sales do not occur on either Hysitron's or MTS's websites. (Johns Decl. ¶ 4; Pearson Aff. Ex. A, Adm. No. 27-30). These products are purchased through direct contact with the manufacturer, and often as the result of a rigorous, months-long RFP process, and after frequent, direct contact with the manufacturer. (Johns Decl. ¶¶ 7, 11.) The relevant class of purchasers in this case are not looking for quick answers about homes listed by Edina Realty on the Multiple Listing Service, *cf. Edina Realty*, 2006 WL 737064. Instead, they are sophisticated scientists and engineers

looking for information about competitive products as the initial step of a long information gathering and purchasing process. Accordingly, the undisputed facts demonstrate that initial interest confusion was not likely and did not occur. Summary judgment in MTS's favor is therefore appropriate.

**III.  SUMMARY JUDGMENT IS APPROPRIATE BECAUSE HYSITRON CANNOT DEMONSTRATE ANY ACTUAL OR POTENTIAL HARM ENTITLING IT TO A REMEDY.**

The Lanham Act may provide a plaintiff remedies for trademark infringement through (1) injunctive relief to prevent definite future injury, and (2) monetary damages to cure actual past injury. 15 U.S.C. §§ 1116, 1117. Hysitron cannot demonstrate any actual or legitimately threatened harm entitling it to money damages or injunctive relief. Having no evidence of actual confusion, Hysitron nonetheless asks this Court to muse whether MTS's now discontinued Sponsored Link advertising program might have nonetheless somehow been likely to have confused the parties' knowledgeable customers in the past, and on that basis, to enjoin conduct that is no longer occurring. Even if Hysitron could somehow show that the Sponsored Link advertising was likely to have caused confusion—and it cannot—there is still no need for an injunction because there is no legitimate threat of future irreparable harm. Moreover, Hysitron cannot demonstrate that any actual confusion occurred when the program was in effect, so it is not entitled to money damages. Therefore, there is no relief for the Court to provide, and indeed, no basis for relief in any event, and hence summary judgment is appropriate.

**A.** **Hysitron Is Not Entitled to Injunctive Relief Because MTS Has Discontinued the Challenged Advertising.**

Even when MTS was running its Sponsored Link advertising, Hysitron recognized that it was not likely to suffer any damage, and, therefore, it did not move for a preliminary injunction. Now, absent evidence of a current or future likelihood of confusion, it is not entitled to, or in need of, permanent injunctive relief. The standard for a permanent injunction is similar to the standard for a preliminary injunction, except that to obtain a permanent injunction, the plaintiff must be successful on the merits. *See Faegre & Benson, L.L.P.*, 447 F. Supp. 2d at 1019 (citing *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999)). Under the well known *Dataphase* factors, a preliminary injunction may be granted only if the moving party can demonstrate: (1) that the movant will suffer irreparable harm absent the injunction; (2) a likelihood of success on the merits; (3) that the balance of harms favors the movant; and (4) that the public interest favors the movant. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). As noted, these same requirements apply to permanent injunctions, except that the plaintiff must, in fact, prevail on the merits.

The party seeking injunctive relief bears the "complete burden" of proving all the *Dataphase* factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). Where, as here, the allegedly infringement has ceased and is unlikely to recur, the need for the injunction is moot. *See Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 207 (7th Cir. 1982) (affirming district court's determination that because party "did not threaten to

persist in or resume the allegedly infringing or unfair conduct, equitable relief would be inappropriate"), *cited in Minn. Pet-Breeders*, 843 F. Supp. at 511.

## 1. Irreparable Harm

The threshold inquiry is whether the moving party has demonstrated that it will suffer irreparable harm absent injunctive relief. *See Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994) ("a party moving for [an] injunction is required to show the threat of irreparable harm."); *see also In re Travel Agency Com'n Antitrust Litig.*, 898 F. Supp. 685, 689 (D. Minn. 1995) ("[A]n injunction cannot issue based on imagined consequences of an alleged wrong. Instead, there must be a showing of imminent irreparable injury."). Harm that is merely possible or speculative will not support injunctive relief. *Northland Ins. Cos.*, 115 F. Supp. 2d at 1116.

The standard for proving irreparable harm was recently heightened by the U.S. Supreme Court when it expressed its disapproval of a blanket presumption of irreparable harm in intellectual property actions in *eBay, Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837, 1839 (2006). The Court held that irreparable harm cannot be presumed in patent infringement cases; the party seeking injunctive relief must establish that such harm, in fact, will occur to justify the requested relief. District courts have since applied the Court's reasoning to trademark cases, holding that proof of trademark infringement alone is insufficient to justify an injunction and that plaintiffs must still demonstrate an actual irreparable injury. *See Harris Research Inc. v. Lydon*, 505 F. Supp. 2d 1161, 1168 (D. Utah 2007); *see also Lorillard Tobacco Co. v. Engida*, No. 06-1115, 2007 WL 39207

(10th Cir. Jan. 8, 2007) (holding injunction not warranted, reasoning that "injury must be both certain and great, and [] not merely serious or substantial") (citation omitted); *MyGym L.L.C. v. Engle*, No. 1:06-CV-130 TC, 2006 WL 3524474 (D. Utah Dec. 6, 2006) (holding plaintiff did not establish irreparable harm from trademark infringement and thus right to relief was not "clear and unequivocal"). Thus, to be entitled to an injunction, a plaintiff must demonstrate both liability *and* a clear threat of actual irreparable harm. *Id.*; *and see Advanced Res. Intern., Inc. v. Tri-Star Petroleum Co.*, 4 F.3d 327, 329-30 (4th Cir. 1993) (affirming summary judgment in part because plaintiff failed to demonstrate irreparable harm without injunction, and noting, "claims of potential damage are entirely too conjectural to support [the] claim").

Here, Hysitron cannot demonstrate that is has suffered, or is likely to suffer, irreparable harm. MTS has discontinued the Sponsored Link advertisement with the keyword "hysitron" and further, has offered to enter a more formalized undertaking. Hysitron has adduced no evidence of actual damage or likelihood of confusion resulting from MTS's former Sponsored Link advertisement. Any claim of future damage would be entirely conjectural, rendering Hysitron's claim moot. *See Gater.com v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129–1131 (9th Cir. 2005) ("requisite case or controversy is absent where [the party] no longer wishes—or is no longer able—to engage in the activity"). Moreover, MTS has no intention to utilize the "hysitron" keyword in the future. (Johns

Decl. ¶ 12.) Because there is no past harm or threat of future harm, injunctive relief is unwarranted. Hence, there is no basis for the Court to permit this lawsuit to continue.

## 2. Balance of Harm

As noted above, Hysitron's allegations of harm are, at best, conjectural and speculative. It has failed to present any evidence of actual confusion, or that substantial confusion to an appreciable number of consumers was likely to result from MTS's Sponsored Link advertising. Moreover, and in addition to the fact that the program never caused confusion while it was in place, there is no plausible threat of future harm because MTS has discontinued the program. Thus, Hysitron will not suffer any harm if an injunction does not issue, and the balance of harms does not weigh in its favor.

## 3. Public Interest

Just as the balance of harms does not justify an injunction in this case, the public interest weighs heavily in favor denying an injunction and issuing summary judgment. Hysitron cannot show that MTS's Sponsored Link advertisement was likely to have confused Internet users. Just as the balance of harms does not justify an injunction in this case, the public interest weighs heavily in favor denying an injunction and issuing summary judgment.

Rather than causing confusion, MTS's Sponsored Link advertisement served only to foster competition. There is a strong public interest in encouraging competition. *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 505 (8th Cir. 1987). Indeed, the essence of the public interest in competition is the existence of alternative

choices between competing products or services.  *See Toro Co.*, 787 F.2d at 1216 ("[T]he law does not foreclose a competitor from zeroing in on a profitable market segment and offering an alternative product."); see also *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co., Inc.*, 963 F.2d 628, 640 (3d Cir. 1992) (reasoning that "courts should tailor trademark remedies to decrease the likelihood of confusion without unnecessarily inhibiting competition").

Here, the display of MTS's clearly identified competitive advertising on a search-result page does not violate the public interest or the policy underlying the Lanham Act; rather, it presents consumers choices and fosters competition in the market.  Such competitive activity is legitimate and entirely consistent with the goals of trademark law.

### 4.    Success on the Merits

Hysitron cannot succeed on the merits because MTS's Sponsored Link advertisement did not constitute "use" as a matter of law.  And again, even if the Sponsored Link advertisement was deemed "use" within the Lanham Act, there are no genuinely disputed facts from which a reasonable juror could conclude that an appreciable number of consumers were likely to have been confused as to the source of MTS's products as a result of the Sponsored Link advertisement.  That said, even if Hysitron could prevail on the merits, the balance of the other *Dataphase* factors weigh in favor of denying a needless injunction.  A permanent injunction is an extraordinary remedy; absent a clear basis and need, it should not be issued.

**B.      Hysitron Is Not Entitled to Monetary Damages Because It Has Not Shown and Cannot Show Actual Confusion.**

To recover money damages for trademark infringement or unfair competition, a plaintiff must show, among other things, that consumers were actually confused as to the source, affiliation, sponsorship or goods or services and that actual confusion caused tangible losses such as lost profits.  *See*, *e.g. Rainbow Play Sys. v. Groundscape Techs.*, 364 F. Supp. 2d 1026, 1036 (D. Minn. 2005).  This cognizable-injury requirement is consistent with the Lanham Act's requirement that monetary relief be compensatory, not punitive.  15 U.S.C. § 1117.  Moreover, attorneys' fees may be awarded under the Act only in "exceptional cases," and at the court's discretion.  15 U.S.C. § 1117.  Courts typically award attorneys' fees only when the infringement is shown to have been malicious, fraudulent, deliberate and willful. *Minn. Pet-Breeders*, 843 F. Supp. at 520; *see, e.g., Wildlife Research Ctr. v. Robinson Outdoors*, 409 F. Supp. 2d 1131, 1135 (D. Minn. 2005).

Hysitron has not provided evidence of any actual confusion, or that it lost even a single dollar in sales as a result of confusion caused by MTS's Sponsored Link advertising.  Nor has Hysitron adduced any evidence that MTS engaged in malicious conduct, so this can hardly be called an "exceptional case" warranting attorneys' fees—particularly because the competitive activity at issue has been approved by courts across the country.

## CONCLUSION

MTS's Sponsored Link advertisement is not "use" of Hysitron's trademark as a matter of law, and even if it were, there are no genuinely disputed material facts from which a reasonable juror could conclude that customers would likely have been confused by the advertisement when it ran. Hysitron cannot show the threat of future harm necessary for injunctive relief, and it cannot demonstrate the actual confusion necessary for money damages. Litigating for months, if not years, over the fundamentally academic question of whether MTS's now discontinued Sponsored Link advertising might have in the past been likely to have caused confusion to an appreciable number of the parties' highly sophisticated customers—when, in fact, there is no evidence whatsoever that it actually did cause confusion—would be an expensive, wasteful, and utterly futile exercise.

The law does not preclude the display of advertisements that provide consumers with alternative choices and a greater information on the same search-results page. Trademark law has long recognized the legitimacy of this kind of competitive activity. MTS's Sponsored Link advertisement did not use Hysitron's mark in commerce by affixing it to MTS's product or advertising information. In fact, Hysitron's mark was not displayed in the Sponsored Link advertising at all. Reading the Lanham Act to reach claims such as these, where there is no tangible connection between the mark and the competing product, would take trademark law far beyond its purpose, with the resulting

effect of stifling competition. Hysitron has suffered no past damage and faces no plausible threat of future irreparable injury. Because Hysitron is not entitled to either injunctive relief or damages, MTS respectfully requests that the Court grant summary judgment on Hysitron's trademark infringement claims.

Respectfully submitted,

Dated: April 14, 2008

WINTHROP & WEINSTINE, P.A.

By: s/ David P. Pearson
David P. Pearson, #84712
William A. McNab, #320924
Kyle J. Kaiser, #0345106
Jessica S. Karich, #0387156
Suite 3500
225 South Sixth Street
Minneapolis, Minnesota 55402
Tel:      (612) 604-6400
Fax:      (612) 604-6800
*Attorneys for MTS Systems Corporation*

3722646v5