IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| HYSITRON INCORPORATED,<br>a Minnesota corporation, | ) ) ) | Civil Action No. 07 CV 1533 ADM/AJB |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| MTS SYSTEMS CORPORATION,<br>a Minnesota corporation, | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFF HYSITRON INCORPORATED'S
MEMORANDUM OF LAW IN OPPOSITION TO
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Allen W. Hinderaker #45287
Tong Wu #0288974
Brian Platt *pro hac vice*
MERCHANT & GOULD P.C.
80 South Eighth Street, #3200
Minneapolis, MN 55402-4131
Telephone No.: 612.332.5300
Facsimile No.: 612.332.9081

**ATTORNEYS FOR PLAINTIFF
HYSITRON INCORPORATED**

**Table of Contents**

TABLE OF AUTHORITIES.................................................................................iii

I.  INTRODUCTION ..................................................................................... 1

II. BACKGROUND.......................................................................................... 4

III. ARGUMENT .............................................................................................. 7

    A.    MTS' PURCHASE OF THE HYSITRON MARK AS A
           SPONSORED LINK IS A "USE IN COMMERCE" AS A
           MATTER OF LAW. ..................................................................... 8

    B.    INITIAL INTEREST CONFUSION. ......................................... 14

    C.    MATERIAL QUESTIONS OF FACT PRECLUDE
           SUMMARY JUDGMENT ON WHETHER MTS' USE OF
           THE HYSITRON MARK CREATED A LIKELIHOOD OF
           INITIAL INTEREST CONFUSION. .......................................... 19

           1.    Strength of the Owner's Mark............................................ 21

           2.    The Similarity of the Owner's Mark to the Alleged
                 Infringer's Mark. .............................................................. 22

           3.    The Degree to Which the Products Compete With
                 Each Other........................................................................ 22

           4.    Infringer's Intent to "Pass Off" its Goods as Those of
                 The Trademark Owner. ..................................................... 23

           5.    Incidents of Actual [Initial Interest] Confusion. .............. 26

           6.    Whether the Degree of Care Exercised by the
                 Consumer Can Eliminate a Likelihood of Confusion
                 that Otherwise Would Exist. ............................................ 27

    D.    HYSITRON'S REMEDY FOR UNLAWFUL USE OF THE
           HYSITRON MARK IS AN INJUNCTION................................. 29

           1.    The Court Must Consider the Merits of Hysitron's
                 Lanham Act Claim Before Considering a Permanent
                 Injunction. ....................................................................... 30

2.      Material Questions of Fact Preclude Summary
        Judgment  on the Question of Potential Harm to
        Hysitron. ........................................................................................... 33

IV.  **CONCLUSION** ................................................................................**34**

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

<u>3M v. Rauh Rubber, Inc.</u>,
130 F.3d 1305 (8th Cir. 1997) ....................................................................................20

<u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242 (1986)..........................................................................................7, 8, 19, 27

<u>Boston Duck Tours, LP v. Super Duck Tours, LLC</u>,
527 F. Supp. 2d 205 (D. Mass. 2007) .......................................................................13

<u>Brookfield v. Communs. v. W. Coast Entm't Corp.</u>,
174 F.3d 1036 (9th Cir. 1999) ...............................10, 15, 16, 18, 19, 20, 21, 22, 23, 27

<u>Buying for the Home, LLC v. Humble Abode, LLC</u>,
459 F. Supp. 2d 310 (D.N.J. 2006) ......................................................................9, 13

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986) ...............................................................8

<u>Coca-Cola Co. v. Purdy</u>, 74 U.S.P.Q.2D (BNA) 1048,
2005 U.S. Dist. LEXIS 1226 (D. Minn. 2005) .........................................10, 18, 26, 27

<u>Conversive, Inc. v. Conversagent, Inc.</u>,
433 F. Supp. 2d 1079 (C.D. Cal. 2006) .........................................................14, 24, 25

<u>Dataphase Systems, Inc. v. C L Systems, Inc.</u>,
640 F.2d 109 (8th Cir. 1981) .........................................................................30, 31, 32

<u>Duluth News-Tribune v. Mesabi Publ. Co.</u>,
84 F.3d 1093 (8th Cir. 1996) .....................................................................................21

<u>Edina Realty, Inc. v. TheMLSonline.com</u>, 80 U.S.P.Q.2D (BNA) 1039, 2006
U.S. Dist. LEXIS 13775 (D. Minn. 2006) ...........2, 9, 11, 13, 14, 19, 20, 21, 22, 23, 25

<u>Enter. Bank v. Magna Bank</u>,
92 F.3d 743 (8th Cir. 1996) .........................................................................................8

<u>Escercizio v. Roberts</u>,
944 F.2d 1235 (6th Cir. 1991) ...................................................................................25

<u>Faegre & Benson, LLP v. Purdy</u>,
447 F. Supp. 2d 1008 (D. Minn. 2006)......................................................................30

GEICO v. Google, Inc.,
   330 F. Supp. 2d 700 (E.D. Va. 2004) ....................................................9, 13

GoTo.com, Inc. v. Walt Disney Co.,
   202 F.3d 1199 (9th  Cir. 2000) .................................................................31

Google Inc. v. Am. Blind & Wallpaper Factory, Inc.,
   2007 U.S. Dist. LEXIS 32450 (N.D. Cal. 2007) .....................................9, 13

Green Prods. Co. v. Independence Corn By-Products. Co.,
   992 F. Supp. 1070 (N.D. Iowa 1997)...........................................................18

Gregerson v. Vilana Financial, Inc., 84 U.S.P.Q.2D (BNA)
   1219, 2006 U.S. Dist. LEXIS 81731 (D. Minn. 2006) ................................20

Gregerson v. Vilana Financial, Inc., 84 U.S.P.Q.2D (BNA)
   1245, 2007 U.S. Dist. LEXIS 64960 (D. Minn. 2007) .........................10, 20

Grotrian Helfferich, Schulz. TH. Steinweg NACHF v. Steinway & Sons,
   365 F. Supp. at 707 (S.D.N.Y 1973)....................................................16, 17

Grotrian Helfferich, Schulz. TH. Steinweg NACHF v. Steinway & Sons,
   523 F.2d 1331 (2d Cir. 1975)..........................................................15, 17, 28

Harris Research, Inc. v. Lydon,
   505 F. Supp. 2d 1161 (D. Utah 2007)..........................................................32

eBay, Inc. v. MercExchange, L.L.C.,
   547 U.S. 388 (2006)....................................................................................32

Int'l Profit Assocs. v. Paisola,
   461 F. Supp. 2d 672 (N.D. Ill. 2006) .........................................................14

J.G. Wentworth, S.S.C., Ltd v. Settlement Funding LLC,
   2007 U.S. Dist. LEXIS 288 (E.D. Pa. 2007) .............................................13

Lankford v. Sherman,
   451 F.3d 496 (8th Cir. 2006) .........................................................3, 29, 30

Mars Musical Adv., Inc. v. Mars, Inc.,
   159 F. Supp. 2d 1146 (D. Minn. 2001).........................................................28

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
   475 U.S. 574 (1986).......................................................................................8

Maxwell v. K Mart Corp.,
  880 F. Supp. 1323 (D. Minn. 1995)........................................................8

Merck & Co. v. MediPlan Health Consulting, Inc.,
  425 F. Supp. 2d 402 (S.D.N.Y. 2006)....................................................13

Nissan Motor Co. v. Nissan Computer Corp.,
  378 F.3d 1002 (9th Cir. 2004) ...............................................................14

Northland Ins. Cos. v. Blaylock,
  115 F. Supp. 2d 1108 (D. Minn. 2000)..............................................14, 19

PACAAR Inc. v. TeleScan Technologies, LLC,
  319 F.3d 243 (6th Cir. 2003) ...........................................18, 19, 28

Perfumebay.com Inc. v. eBay Inc.,
  506 F.3d 1165 (9th Cir. 2007) ...........................................31, 32

Playboy Enters., Inc. v. Netscape Communications Corp.,
  354 F.3d 1020 (9th Cir. 2004) ...........................................10, 12, 14, 19

Promatek Indus., Ltd. v. Equitrac Corp.,
  300 F.3d 808 (7th Cir. 2002) ...............................................................20

Rescuecom Corp. v. Google, Inc.,
  456 F. Supp. 2d 393 (N.D.N.Y. 2006)..............................................13, 14

SquirtCo v. Seven-Up Co.,
  628 F.2d 1086 (8th Cir. 1980) ...........................................20, 25

Tdata Inc. v. Aircraft Tech. Publrs.,
  411 F. Supp. 2d 901 (S.D. Ohio 2006) ...........................................24, 25

U-Haul Int'l, Inc. v. WhenU.com, Inc.,
  279 F. Supp. 2d 723 (E.D. Va. 2003) ...........................................12, 13

United States v. W. T. Grant Co.,
  345 U.S. 629 (1953)........................................................3, 29

United States v. Concentrated Phosphate Exp. Ass'n,
  393, US 199 (1968) ...............................................................30

Wells Fargo & Co.  v. WhenU.com,
  293 F. Supp. 2d 734 (E.D. Mich. 2003)....................................................13

## FEDERAL STATUTES

15 U.S.C. § 1116(a) ..........................................................................................31

15 U.S.C. § 1117(a) ............................................................................................3

Fed. R. Civ. P. 56(f) ......................................................................................3, 7

Fed. R. Civ. P. 56(c) ..........................................................................................7

Plaintiff Hysitron Incorporated ("Hysitron") respectfully submits this memorandum of law in opposition to Defendant MTS Systems Corporation's ("MTS") motion for partial summary judgment.

## I.      INTRODUCTION

Hysitron's identity has been misappropriated and misused by a competitor.  The HYSITRON mark is the symbol that embodies the company's reputation and renown.  The misappropriation of Hysitron's valuable mark is not "much ado about nothing."  Rather, it is unlawful conduct for which the Lanham Act provides a remedy.  MTS admits that it

> obtained the keyword "hysitron" from Google, which triggered MTS's Sponsored Link advertisement to appear on the search-result page . . . .

(MTS' Mem. Law Supp. Mot. Part. S.J. at 9.)  As MTS concedes,

> [w]hen a web user performed an Internet search with the keyword "hysitron," the keyword program caused a Sponsored Link advertisement for MTS's website to appear on the same page as the list of websites produced by the search engine.

(MTS' Mem. Law Supp. Mot. Part. S.J. at 2.)  Although MTS claims to have committed no wrong, it also claims to have "discontinued the program" earlier this year.  (Id. at 10; see also Declaration of Margaret Johns ("Johns Decl.") ¶ 12.)  Hysitron's investigation showed MTS' continued use of the HYSITRON mark for sponsored links even after the filing of MTS' motion.  (Declaration of Brian N. Platt ("Platt Decl.") Ex. 6 (Gmail).)[1]

---

[1] In response to Hysitron's notice to Magistrate Judge Boylan of MTS' continued use of the HYSITRON mark, MTS filed the Declaration of Brandon Rochelle [Docket No. 105],

Regardless of MTS' promise to cease infringement, Hysitron seeks the remedy the law

provides: an injunction against MTS' wrongful infringement of the HYSITRON mark.[2]

The Court should deny MTS' motion for summary judgment. First, the majority

view, including this judicial district, considers purchase of a competitor's trademark "use

in commerce" based on the plain meaning of the Lanham Act. "Based on the plain

meaning of the Lanham Act, the purchase of search terms is a use in commerce." Edina

Realty, Inc. v. TheMLSonline.com, 80 U.S.P.Q.2D (BNA) 1039, 2006 U.S. Dist. LEXIS

13775, *9-10 (D. Minn. 2006) (Tunheim, J.). MTS' concedes the purchase of the

HYSITRON search term, or keyword. (MTS' Mem. Law Supp. Mot. Part. S.J. at 9.)

MTS' purchase of the HYSITRON keyword is use in commerce as a matter of law.

Second, while MTS urges that "Hysitron has adduced no evidence from which a

reasonable juror could conclude [there was] consumer[] confusion about the source of

---

which purportedly explains MTS' continued use of the HYSITRON mark.

[2] MTS' memorandum of law opens with a progression of misstatements and
misrepresentations, ostensibly based on Hysitron's choice of remedy. In order to ensure
accurate consideration by the Court, a correction of the record is necessary. First,
Hysitron never "essentially acknowledged that [MTS'] conduct . . . did not cause any
actual confusion about . . . MTS's goods." (MTS' Mem. Law Supp. Mot. Part. S.J. at 1.)
This is an outrageous misrepresentation ostensibly predicated on Hysitron's answer to
Interrogatory No. 20 (See id. at 10 (citing Pearson Aff., Ex. B, Int. No. 20)). That answer
only states that Hysitron seeks injunctive relief and an award of its reasonable attorneys'
fees and costs. Second, Hysitron never "admit[ted] that it is not entitled to recover
damages." (MTS' Mem. Law Supp. Mot. Part. S.J. at 1.) Hysitron's choice of an
injunction as remedy is not an admission on entitlement to damages. Lastly, Hysitron
never "admitted that the consumers understand the difference between MTS and
Hysitron." (See id. at 25 (citing Pearson Aff., Ex. A, Adm. No. 32)). Admission No. 32
only relates to whether "purchasers of [Hysitron's] goods and services have advanced
scientific degrees." In response, Hysitron admits that "some of Plaintiff's purchasers
have advanced scientific degrees."

MTS's products" (See MTS' Mem. Law Supp. Mot. Part. S.J. at 2), it ignores the outrageous subtext. MTS has actively refused to answer *all* discovery related to Hysitron's trademark claim. (See generally Hysitron's Mem. Law Supp. Mot. Compel [Docket No. 84]). MTS' motion for partial summary judgment must fail for this reason alone. See Fed. R. Civ. P. 56(f). MTS' motion also fails because it is unable—having failed to allow discovery—to show the absence of any genuine issue of material fact with regard to likelihood of confusion.

Third, MTS' contention that no remedy is available to right the wrong of trademark infringement because it has promised to stop its infringement is both unavailing and hollow. Even if MTS actually stopped using the HYSITRON mark, its

> voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot.

United States v. W. T. Grant Co., 345 U.S. 629, 632 (1953). MTS' supposed "voluntary cessation [of infringement] does not deprive a federal court of its power to determine the legality of the practice." See Lankford v. Sherman, 451 F.3d 496, 503 (8th Cir. 2006) (internal quotations omitted).[3]

---

[3] MTS complains that Hysitron "claims that it is 'entitled' to persist in this meritless litigation solely in order to recover its attorneys' fees. (See MTS' Mem. Law Supp. Mot. Part. S.J. at 2.) On the contrary, Hysitron is neither so imprudent, nor wealthy, to pursue its claims on the prospect that the Court will find this case "exceptional" and award attorneys' fees under 15 U.S.C. § 1117(a). Rather, Hysitron seeks what it is entitled to under the law: injunctive relief forbidding MTS from trading on the renown and reputation of HYSITRON. At the end of this case, Hysitron will also seek an award of attorneys' fees because MTS' infringement is "exceptional."

## II.      BACKGROUND

MTS purchased the keyword HYSITRON for use as a sponsored link from

Google.  (<u>See</u> Johns Decl. ¶ 12.)  That purchase triggers MTS advertisements, which

appear in Google search results, when the user searches the term "hysitron."   This use

and the resulting appearance of MTS when "hysitron" is the search term is not limited to

search results on Google.com.  Rather, because of the distributed Google enterprise, the

search term "hysitron" triggers MTS advertisements on many and various third-party

search engines, each of which is governed by its own practices.

These third-party websites are not bound to a specific format.  Instead, these

websites may reformat Google advertisements and display them in a manner that matches

non-sponsored search results.  (<u>E.g.</u>, Platt Decl. Ex. 1)  Alternatively, these third-parties

may incorporate the advertisements in the content of their own websites.

As a result, Internet users searching for "hysitron" are presented with a plethora of

links to MTS' website.  These links may simply be embedded with the search results—

disguised among legitimate search hits.  Examples of MTS' advertisements on Google

and several third-party websites are shown below.



(Am. Compl. ¶ 34 (www.google.com)).



(Platt Decl., Ex. 1 (www.webcrawler.com).)



(Platt Decl., Ex. 2 (www.excite.com).)



(Platt Decl., Ex. 3 (www.dogpile.com).)

These examples show variations on MTS' use the HYSITRON mark. In some instances, MTS' advertising is located above and appears to be a part of the actual organic search results. (Am. Compl. ¶ 34). In others, MTS' advertising is buried among and appears without noticeable distinction as part of the organic search results. (Platt Decl., Exs. 1-3). In yet others, MTS advertising is identified as "sponsored by" www.mtsnano.com, creating an impression of affiliation or sponsorship between MTS and the search term "hysitron." The full extent of MTS' misappropriation of the HYSITRON mark remains unknown because MTS has refused all discovery on the matter.

MTS has used the HYSITRON mark to entice customers interested in searching for Hysitron to be diverted to its website. MTS formatted its advertising to create the impression of a relationship between MTS and the search term "hysitron." MTS targeted its advertising to capitalize on Hysitron's goodwill. The number or percentage of persons

who search for "hysitron" and were diverted to the MTS website is data documented by Google, within Hysitron's outstanding discovery requests, and among the information that MTS has refused to produce.  MTS has also refused production of internal documents and correspondence relating to its intent in purchasing the search term "hysitron" to capitalize on Hysitron's reputation and renown.

MTS' conduct continues, causing a likelihood of consumer confusion.  Hysitron documented MTS' sponsored links for the HYSITRON mark even after the filing of MTS' motion for partial summary judgment.  (Platt Decl. Ex. 6.)  Hysitron's motion to compel MTS to provide discovery relating to its infringement of the HYSITRON mark is pending decision before Magistrate Judge Boylan.  (See generally Hysitron Mem. Law Supp. Mot. Compel [Docket No. 84].)  Thirty-five requests for production relating to Hysitron's trademark claims remain unanswered.  (See id.)  The full record can only be developed after discovery.[4]

### III.   ARGUMENT

Summary judgment is appropriate only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In determining whether genuine issues of material fact are present, the Court views the evidence in the light most favorable to the non-moving party, taking every inference in its favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The moving party

---

[4]  Except as discussed during the unsuccessful settlement negotiations mediated by the Court, MTS has offered no assurances, let alone made a binding commitment, regarding its future use of Internet advertising.  (See Platt Decl., Ex. 4 (Pearson Letter).)

bears the burden of demonstrating an absence of any genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Only where the moving party has met its initial burden must the opposing party

show the existence of a genuine issue of fact for trial.  Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment should be granted

only when the evidence is such that no reasonable jury could return a verdict for the non-

moving party.  Anderson, 477 U.S. at 255.  In considering a motion for summary

judgment, "the court views the evidence in favor of the nonmoving party and gives that

party the benefit of all justifiable inferences that can be drawn in her favor."  Maxwell v.

K Mart Corp., 880 F. Supp. 1323, 1329 (D. Minn. 1995); Enter. Bank v. Magna Bank, 92

F.3d 743, 747 (8th Cir. 1996).

## A.  MTS' PURCHASE OF THE HYSITRON MARK AS A SPONSORED LINK IS A "USE IN COMMERCE" AS A MATTER OF LAW.

MTS' concedes facts sufficient for this Court to find "use in commerce" of the

HYSITRON mark, as a matter of law.  MTS concedes its purchase of the HYSITRON

mark for Sponsored Link advertising:

> Approximately two years ago, MTS obtained the keyword
> "hysitron" from Google, which triggered MTS' Sponsored Link
> advertisement to appear on the search result page . . . .

(MTS' Mem. Law Supp. Mot. Part. S.J. at 9; see also Johns Decl. ¶ 12.)  MTS explained

its use of the HYSITRON mark:

> [w]hen a web user performed an Internet search with the keyword
> "hysitron," the keyword program caused a Sponsored Link
> advertisement for MTS's website to appear on the same page as the
> list of websites produced by the search engine.

(MTS' Mem. Law Supp. Mot. Part. S.J. at 2.)

MTS' purchase of the HYSITRON mark as a search term constitutes a "use in commerce." Edina Realty, Inc., 80 U.S.P.Q.2D (BNA) 1039, *9-10 (D. Minn. 2006) ("Based on the plain meaning of the Lanham Act, the purchase of search terms is a use in commerce."). Courts across the country have agreed: the "purchase of the keyword was a commercial transaction that occurred 'in commerce,' trading on the value of Plaintiff's mark." Buying for the Home, LLC v. Humble Abode, LLC, 459 F. Supp. 2d 310, 324 (D.N.J. 2006); accord Google Inc. v. Am. Blind & Wallpaper Factory, Inc., 2007 U.S. Dist. LEXIS 32450 (N.D. Cal. Apr. 18, 2007) ("This Court thus concludes, as did the courts in GEICO, 800-JR Cigar, Humble Abode, Edina Realty, and Wentworth, that the sale of trademarked terms in the [Google] AdWords program is a use in commerce for the purposes of the Lanham Act.").

In evaluating use in commerce in the Internet context, courts have focused on the commercial effect of an activity.

> While not a conventional 'use in commerce,' defendant nevertheless
> uses the Edina Realty mark commercially.  Defendant purchases
> search terms that include the Edina Realty mark to generate its
> sponsored link advertisement.

Edina Realty, 80 U.S.P.Q.2D (BNA) 1039, *9-10.  Humble Abode similarly noted the commercial nature of the defendants' purchase of the TOTAL BEDROOM mark, and the commercial effect of triggering advertising:

> First, the alleged purchase of the keyword was a commercial transaction that occurred "in commerce," trading on the value of Plaintiff's mark. Second, Defendants' alleged use was both "in commerce" and "in connection with any goods or services" in that Plaintiff's mark was allegedly used to trigger commercial advertising which included a link to Defendants' furniture retailing website. Therefore, not only was the alleged use of Plaintiff's mark tied to the promotion of Defendants' goods and retail services, but the mark was used to provide a computer user with direct access (i.e., a link) to Defendants' website through which the user could make furniture purchases. The Court finds that these allegations clearly satisfy the Lanham Act's "use" requirement.

459 F. Supp. 2d at 323. The commercial nature is dispositive: because the purchase of the trademark keyword occurred in commerce with a commercial effect, the district court necessarily concluded that the use must be "in commerce." Id.

This Court has acknowledged that "[a] defendant's use of a plaintiff's trademarks in his metatags for the purpose of diverting internet traffic away from the plaintiff's website and onto the defendant's website can constitute trademark infringement . . . ." Gregerson v. Vilana Financial, Inc., 84 U.S.P.Q.2D (BNA) 1245, 2007 U.S. Dist. LEXIS 64960, *14-15 (D. Minn. 2007) (Montgomery, J.). Implicit in a finding of infringement is the Lanham Act's "use in commerce" requirement. See id. at *15-16 (citing Brookfield Communs. v. W. Coast Entm't Corp., 174 F.3d 1036, 1062-65 (9th Cir. 1999) ("[I]nitial interest confusion" cases generally concern competing products.")); accord Google, 2007 U.S. Dist. LEXIS 32450, *17-19 (noting an implicit finding of "use in commerce" in the Playboy's likelihood-of-confusion analysis). The same finding of use in commerce is implicit in this court's likelihood of confusion analysis in Coca-Cola Co. v. Purdy, 74 U.S.P.Q.2D (BNA) 1048, 2005 U.S. Dist. LEXIS 1226, *7-10 (D. Minn.

2005) (Montgomery, J.).  In this case, the commercial nature of the transaction is dispositive on the question of "use in commerce."  <u>E.g.</u>, <u>Edina Realty</u>, 80 U.S.P.Q.2D (BNA) 1039, *9-10.

MTS attempts to distinguish <u>Edina Realty</u> by arguing that "use" should turn on "whether or not the alleged infringer actually places the mark on any goods or services in order to pass them off as the competitor's."  (<u>See</u> MTS' Mem. Law Supp. Mot. Part. S.J. at 15.)  MTS' argument, however, confuses a fact related to the issue of likely confusion, mistake, or deception, with the legal issue of "use" under the Lanham Act.  The argument is also without basis as Judge Tunheim explicitly noted the absence of the proffered distinction.

> The advertising text has changed over time. In spring 2005, plaintiff persuaded Google to forbid defendant from using the phrase Edina Realty in its advertising, which Google allowed for the two previous years.

<u>Edina Realty</u>, 80 U.S.P.Q.2D (BNA) 1039, *4 n.1 (emphasis added).  When decided in 2006, Google had already forbidden "defendant from using the phrase Edina Realty in its advertising."  <u>Id.</u>  MTS' claimed distinction was absent.  Judge Tunheim rejected the argument, now advanced by MTS, that the defendant's "purchase of search terms is not a 'use in commerce' because there is no public promotion of the mark during the search transaction."  <u>See</u> <u>Edina Realty</u>, 80 U.S.P.Q.2D (BNA) 1039, *9-10.

In a further attempt to distinguish <u>Edina Realty</u>, MTS analogizes cases that have considered "pop-up" advertising.  A "pop-up" ad is an advertisement that automatically "pops up" in a separate window, often obscuring the original Web page until the

"pop-up" window is closed or moved.  The function of pop-up advertising, however, differentiates it from MTS' use of Sponsored Link advertising.  MTS purchased the search term "hysitron," and Google's program provides MTS' advertising in response to an Internet user's choice to search for "hysitron."  (MTS' Mem. Law Supp. Mot. Part. S.J. at 2.)  The search term "hysitron" appears in the search window.  The diversion of initial interest confusion is easily effected in this circumstance, through the presentation of unaffiliated advertising misleading and deceptive as to source, sponsorship, or affiliation.  Playboy Enters., Inc. v. Netscape Communications Corp., 354 F.3d 1020, 1025 (9th Cir. 2004).  Pop-up advertising, on the other hand, appears based on the totality of "the user's Internet activity."  U-Haul Int'l, Inc. v. WhenU.com, Inc., 279 F. Supp. 2d 723, 727-28 (E.D. Va. 2003).  While intrusive and annoying, a "pop-up" ad is different because it provides advertising in the context of Internet activity, in a separate window; it is not specifically based on a competitor's trademark.  The advertising is not specifically targeted to effect confusion of initial interest based on a competitor's mark.  See also Google, 2007 U.S. Dist. LEXIS 32450, *8-9 (rejecting pop-up advertising cases and finding Google sponsored links are "use in commerce.").

The "pop-up" cases are also readily distinguishable on their facts from sponsored link advertising.  MTS first relies on U-Haul Int'l, 279 F. Supp. 2d 723, describing the facts as "finding no Lanham Act use because ***pop-up ad was separate and distinct*** from plaintiff's website and ***Internet users were not hindered*** from accessing plaintiff's website."  (See MTS' Mem. Law Supp. Mot. Part. S.J. at 18 (emphasis added).)  Pop-up advertising "separate and distinct" from a website, or search results, is less likely to divert

initial consumer interest.  See U-Haul, 279 F. Supp. 2d at 729; accord Wells Fargo & Co.

v. WhenU.com, 293 F. Supp. 2d 734, 761 (E.D. Mich. 2003) ("WhenU advertisements

appear on a computer screen at the same time . . . .").  But, MTS sponsored links do not

spawn a "***pop-up ad separate and distinct***" from the search page, like the WhenU.com

advertisements.  MTS' results are integrated into the organic search results.  (E.g., Platt

Decl. Exs 1-3.)

MTS also devotes much of its briefing to the minority viewpoint of the Second

Circuit.  E.g., Merck & Co. v. MediPlan Health Consulting, Inc., 425 F. Supp. 2d 402

(S.D.N.Y. 2006); Rescuecom Corp. v. Google, Inc., 456 F. Supp. 2d 393 (N.D.N.Y.

2006).  The Second Circuit decisions hold that the purchase of trademark keywords is not

a "use in commerce" because it is internal to the search engine, and is more "analogous to

a[n] individual's private thoughts about a trademark."  Merck, 425 F. Supp. 2d at 415.

But, "the emerging view outside of the Second Circuit is in accord with the plain

language of the statute.  Because sponsored linking necessarily entails the 'use' of the

[]mark as part of a mechanism of advertising, it is 'use' for Lanham Act purposes."

Boston Duck Tours, LP v. Super Duck Tours, LLC, 527 F. Supp. 2d 205, 207 (D. Mass.

2007).

The majority of courts to consider the question have deferred to the plain language

of the Lanham Act: "the purchase of search terms is a use in commerce."  E.g., Edina

Realty, 80 U.S.P.Q.2D (BNA) 1039, at *9-10; GEICO v. Google, Inc., 330 F. Supp. 2d

700 (E.D. Va. 2004); Google Inc. v. Am. Blind & Wallpaper Factory, Inc., 2007 U.S.

Dist. LEXIS 32450; Buying for the Home, 459 F. Supp. 2d 310; J.G. Wentworth, S.S.C.,

Ltd v. Settlement Funding LLC, 2007 U.S. Dist. LEXIS 288 (E.D. Pa. 2007);

Rescuecom, 464 F. Supp. 2d 1263; Int'l Profit Assocs. v. Paisola, 461 F. Supp. 2d 672

(N.D. Ill. 2006).

## B.     INITIAL INTEREST CONFUSION.

The question is not, as MTS urges, whether a "likelihood of confusion" exists at

the time of sale.  Rather, the issue in this case is "initial interest confusion" – whether

MTS used "plaintiff's trademark in a manner calculated to capture initial consumer

attention."[5]  Conversive, Inc. v. Conversagent, Inc., 433 F. Supp. 2d 1079, 1093 (C.D.

Cal. 2006) (citing Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1018-19

(9th Cir. 2004)).  Initial interest confusion creates an initial interest in a competing

product, based on the popularity, reputation, or renown of a mark.  Playboy Enters., Inc.

v. Netscape Communications Corp., 354 F.3d 1020, 1025 (9th Cir. 2004).  Although

dispelled before the consummation of a sale, initial interest confusion impermissibly

capitalizes on the goodwill associated with a mark and is therefore actionable trademark

infringement.  Id.

For example, in Playboy the Ninth Circuit considered the keying of the search

term "playboy" to the display of third-party, adult-oriented advertising.  354 F.3d 1022-

23.  In reversing a grant of summary judgment for the defendant, the court noted that the

intent to confuse constituted probative evidence of likely confusion: courts assume that

the defendant's intentions were carried out successfully.  Id. at 1028.

---

[5] The Eighth Circuit has not addressed which factors are most relevant when plaintiff
invokes the initial confusion doctrine.  Northland Ins. Cos. v. Blaylock, 115 F. Supp. 2d
1108, 1119 (D. Minn. 2000); but see Edina Realty, 80 U.S.P.Q.2d. (BNA) 1039, *14-19.

In <u>Brookfield</u>, the Ninth Circuit concluded that the use of the trademark "MovieBuff" in website metatags caused a likelihood of initial interest confusion, even without confusion as to source.  174 F.3d at 1062-63 ("[T]he diversion of consumers' initial interest is a form of confusion against which the Lanham Act protects . . . .")  The panel described the hypothetical "diverted" consumer:

> Web surfers looking for Brookfield's "MovieBuff" products who are taken by a search engine to "westcoastvideo.com" will find a database similar enough to "MovieBuff" such that a sizeable number of consumers who were originally looking for Brookfield's product will simply decide to utilize West Coast's offerings instead.

<u>Id.</u> at 1062.  The Court noted that while there was no "source confusion," there was initial interest confusion because persons looking for "MovieBuff" were improperly diverted to the defendant's site based on goodwill developed in plaintiff's mark.  <u>See id.</u> at 1062-63.

In <u>Grotrian</u>, a non-Internet case, the Second Circuit explained initial-interest confusion with regard to plaintiff Steinway's claim that the defendant, through use of the "Grotrian-Steinweg" mark, attracted people really interested in "Steinway" pianos:

> The issue here is not the possibility that a purchaser would buy a Grotrian-Steinweg thinking it was actually a Steinway or that Grotrian had some connection with Steinway and Sons. The harm to Steinway, rather, is the likelihood that a consumer, hearing the "Grotrian-Steinweg" name and thinking it had some connection with "Steinway," would consider it on that basis. The "Grotrian-Steinweg" name therefore would attract potential customers based on the reputation built up by Steinway in this country for many years.

<u>Grotrian, Helfferich, Schulz. TH. Steinweg NACHF v. Steinway & Sons</u>, 523 F.2d 1331, 1342 (2d Cir. 1975).  And so it is with MTS and Hysitron: a consumer searching for

Hysitron, and seeing the MTS sponsored link, is likely to mistakenly believe or be

deceived that it had some connection to Hysitron.

> **a.    Cost of goods and purchaser sophistication**
> **does not moot initial interest confusion.**

Contrary to MTS' assertions, the fact of initial interest confusion is not obviated

by the alleged "sophistication and expertise" of purchasers.  And the question is not

whether "nanomechanical testing equipment . . . [is] sold over the Internet by a 'click' on

the 'purchase' button."  (See MTS' Mem. Law Supp. Mot. Part. S.J. at 5).  Initial interest

confusion requires merely the "diversion of consumers' initial interest . . . ."  Brookfield,

174 F.3d at 1062-63.  No purchase is required.

The "cost" at issue is the consumer's cost of being diverted: merely a point and a

click.  The court in Grotrian commented on the thought processes of potential buyers of

"Steinweg" pianos:

> Misled into an initial interest, a potential Steinway buyer may satisfy
> himself that the less expensive Grotrian-Steinweg is at least as good,
> if not better, than a Steinway.

523 F.2d at 1341 (quoting Grotrian, Helfferich, Schulz. TH. Steinweg NACHF. v.

Steinway & Sons, 365 F. Supp. 707, 717 (S.D.N.Y. 1973)).  The district court noted

question of sophistication, and Grotrian-Steinweg's argument that purchasers would not

be confused because of the degree of their sophistication and the price of the goods.

> It is true that deliberate buyers of expensive pianos are not as
> vulnerable to confusion as to products as hasty buyers of
> inexpensive merchandise at a newsstand or drug store.  It is the
> subliminal confusion apparent in the record as to the relationship,
> past and present, between the corporate entities and the products that

> can transcend the competence of even the most sophisticated
> consumer.

*Grotrian*, 365 F. Supp. at 717.  Notwithstanding the high cost of a Steinway piano and the

care normally associated with a purchase of that kind, the court considered how initial

interest confusion could allow the less-expensive Grotrian-Steinweg to leverage its

similarity to divert a consumers' initial interest:

> The harm to Steinway in short is the likelihood that potential piano
> purchasers will think that there is some connection between the
> Grotrian-Steinweg and Steinway pianos.   Such initial confusion
> works an injury to Steinway.

*Grotrian*, 523 F.2d at 1342 (internal citations omitted).  The same concern is present in

this case.

A potential Hysitron customer, aware of Hysitron's reputation and renown,

performs a search for "Hysitron."  Because HYSITRON is a coined and fanciful term, the

potential customer is necessarily looking for the Hysitron company.  The customer's

intention to research the purchase of a HYSITRON test instrument is met with cleverly

disguised advertising for MTS' website.  (Platt Decl., Exs. 1, 2, 3.)  It costs the customer

nothing to select MTS' website.  (See id.)  The benefit to MTS, however, could not be

more pronounced: MTS leveraged the value in the HYSITRON mark to divert initial

customer interest.  The sophistication of the purchaser and cost of the goods *makes no*

*difference* in whether customer attention is unlawfully diverted.  The reason MTS

purchased the search term "hysitron" is fulfilled.

MTS has used the HYSITRON mark to derive a benefit.  The sophistication of

customers notwithstanding, MTS diverts initial customer attention through its use of the

HYSITRON mark: "[T]he mere fact that purchasers may be sophisticated or

discriminating is not sufficient to preclude the likelihood of confusion." Id.

> Deception and confusion thus work to appropriate [Steinway's] good will. This confusion, or mistaken beliefs as to the companies' interrelationships, can destroy the value of the trademark which is intended to point to only one company.  Thus, the mere fact that purchasers may be sophisticated or discriminating is not sufficient to preclude the likelihood of confusion.

Id.  It is the same in this case: MTS works a deception on potential Hysitron

customers by placing advertising (disguised as search results) before customers

searching for Hysitron.  (E.g., Platt Decl., Exs. 1-3).

### b.    Use of the Internet as a marketing tool exacerbates the likelihood of initial interest confusion.

Entering a website from a search engine takes little effort,

> usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership.

PACAAR Inc. v. TeleScan Technologies, LLC, 319 F.3d 243, 252 (6th Cir. 2003)

(overruled on other grounds) (quoting Brookfield, 174 F.3d at 1057).  This Court

recognized this verity in Coca-Cola v. Purdy, highlighting the consensus in the courts:

> Several courts have noted that the quick and effortless nature of "surfing" the Internet makes it unlikely that consumers can avoid confusion through the exercise of due care[.]

74 U.S.P.Q.2D (BNA) 1048, *11-12.  This Court's conclusion that "[a]s a result, ordinary

Internet users do not undergo a highly sophisticated analysis when searching for domain

names," see id., *11 (citing Green Prods. Co. v. Independence Corn By-Products. Co.,

992 F. Supp. 1070, 1079 (N.D. Iowa 1997) (internal quotations omitted)), applies equally to trademark terms misused to sell competing products.

Use of the HYSITRON mark in commerce is a means to divert customer interest quickly and at a low-cost.  Indeed, there may not be a more efficient way to divert initial interest than through sponsored links for trademarked keywords.  Just like Playboy, MTS places advertising before a customer looking for something specific.   354 F.3d at 1025.  Just like Playboy, or Brookfield, or PACAAR, the likeliest way for the customer to investigate the relevance of MTS proffered link is to accede to the diversion.  At that moment, MTS has diverted the initial interest of Hysitron's potential customers.[6]

**C.     MATERIAL QUESTIONS OF FACT PRECLUDE SUMMARY JUDGMENT ON WHETHER MTS' USE OF THE HYSITRON MARK CREATED A LIKELIHOOD OF INITIAL INTEREST CONFUSION.[7]**

"The Eighth Circuit has not addressed which factors are most relevant when plaintiff invokes the initial interest confusion doctrine . . . ."  Edina Realty, 80 U.S.P.Q.2D (BNA) 1039, *12 n.3 (citing Northland Ins. Cos. v. Blaylock, 115 F. Supp. 2d 1108, 1119 (D. Minn. 2000)).  Judicial officers in this district, however, have applied

---

[6]  In addition to MTS' use of the HYSITRON mark, additional factors contribute to a likelihood of confusion.  Notably, an Internet user searching for "hysitron" and familiar with its product line could reasonably mistake advertising "sponsored" by MTS for Hysitron's most famous "TS 70" and "TS 75" TriboScope products.

[7]  MTS' request for partial summary judgment while simultaneously refusing discovery on the same subject is outrageous.  For the reasons set forth in the Rule 56(f) Declaration of Allen Hinderaker ("Hinderaker 56(f) Decl."), MTS' motion should be continued until discovery is allowed under the Rules.  In the alternative, the Court may deny MTS' motion.  MTS cannot sustain its initial burden of demonstrating an "absence of any genuine issue of material fact" on any relevant factor.  E.g., Anderson, 477 U.S. at 255.

the six factors enumerated in <u>SquirtCo v. Seven-Up Co</u>.  628 F.2d 1086, 1090-91 (8th

Cir. 1980); <u>see</u> <u>Edina Realty</u>, 80 U.S.P.Q.2D (BNA) 1039, *15-19 (<u>citing</u> <u>3M v. Rauh</u>

<u>Rubber, Inc.</u>, 130 F.3d 1305, 1308 (8th Cir. 1997).  This Court, in <u>Gregerson v. Vilana</u>

<u>Financial, Inc.</u>, also noted the applicability of the same six factors.  84 U.S.P.Q.2D

(BNA) 1245, *13-15 (D. Minn. 2007) (Montgomery, J.) (<u>citing</u> <u>Hubbard Feeds, Inc. v.</u>

<u>Animal Feed Supplement, Inc.</u>, 182 F.3d 598, 602 (8th Cir. 1999)).[8]

>As stated by this Court, the factors for assessing a likelihood of confusion are:

>>(1) the strength of the owner's mark; (2) the similarity of the owner's mark to the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) whether the degree of care exercised by the consumer can eliminate a likelihood of confusion that otherwise would exist.

<u>Id</u>.[9]  "These factors do not operate in a mathematically precise formula; rather, we use

them at the summary judgment stage as a guide to determine whether a reasonable jury

---

[8] Notably, the facts and outcome of <u>Gregerson</u> are both different from the instant case. As this Court articulated in <u>Gregerson</u>, at the preliminary injunction stage, "[s]everal [metatag] cases cited by Defendants are significantly different, as they involve initial interest confusion in the context of competing products."  84 U.S.P.Q.2D (BNA) 1219, 2006 U.S. Dist. LEXIS 81731, *7 n.1 (D. Minn. 2006) (Montgomery, J.).  Like the metatag cases the Court referenced, *inter alia*, <u>Promatek Indus., Ltd. v. Equitrac Corp.</u>, 300 F.3d 808, 812-13 (7th Cir. 2002) and <u>Brookfield</u>, 174 F.3d 1036, this case involves initial interest confusion in the context of competing products.

[9] The Ninth Circuit has considered whether a likelihood of confusion in the Internet context might be based on the most important factors: (1) the virtual identity of marks, (2) the relatedness or proximity of the two companies' products or services, and (3) the simultaneous use of the Web as a marketing channel.  <u>Brookfield</u>, 174 F.3d at 1055 n.16. Notably, the three "most important" factors for Internet initial interest confusion are undisputed and weigh in favor of a likelihood of confusion.  Under any test, however, MTS' use of the HYSITRON mark results in a likelihood of confusion.

could find a likelihood of confusion." Edina Realty, 80 U.S.P.Q.2D (BNA) 1039, *11

(quoting Duluth News-Tribune v. Mesabi Publ. Co., 84 F.3d 1093, 1096 (8th Cir. 1996)).

"The Court must avoid excessive rigidity when applying the law in the Internet context

because emerging technologies require a flexible approach." Id. (quoting Brookfield, 174

F.3d at 1054.)

### 1.    Strength of the Owner's Mark.

MTS concedes that the HYSITRON mark "may be fanciful and therefore, under

traditional trademark analysis, would be entitled to a broad scope of protection." (See

MTS' Mem. Law Supp. Mot. Part. S.J. at 26).  MTS correctly states the law: "Fanciful

marks are, in essence, made-up words expressly coined to serve as a trademark." (See id.

(citing 1 J. Thomas McCarthy, McCarthy on Trademark and Unfair Competition § 11.01

(2008).)  The term "hysitron" is a fanciful coined term that serves only as a trademark,

representing the reputation and renown of Hysitron.  "An arbitrary or fanciful trademark

is the strongest type of mark and is afforded the highest level of protection." Duluth

News-Tribune, 84 F.3d at 1096.

MTS concession that the HYSITRON mark is entitled to the highest level of

protection means this factor weighs in favor of a likelihood of confusion.[10]

---

[10] MTS attempts to graft a supplemental analysis onto the Court's consideration, arguing
it never affixed the Hysitron mark to its products.  Again, MTS confuses a fact bearing on
the issue of likely confusion, mistake, and deception with the issue of the strength of the
HYSITRON mark.  Its argument lacks support in the case law and should be rejected.
The issue is strength of the mark, and the HYSITRON mark is "the strongest type of
mark . . . ." Duluth News-Tribune, 84 F.3d at 1096.

2.      **The Similarity of the Owner's Mark to the Alleged Infringer's Mark.**

On this factor, MTS over-complicates an otherwise simple inquiry: how *similar* is the mark that MTS' is using to market its products (i.e., the HYSITRON mark)?  It is identical.  Judge Tunheim answered this question in Edina Realty: "It is undisputed that defendant uses a mark *identical* to plaintiff's by purchasing Edina Realty as a search term . . . ." 80 U.S.P.Q.2D (BNA) 1039, *15.[11]   The Court further observed that "use of the identical mark increases the likelihood of confusion." Id.  This factor considers MTS' admitted purchase of the HYSITRON mark, as a sponsored link, to compete with Hysitron.  For purposes of the six factor analysis, the mark is *identical* as a matter of law. Id.; accord Brookfield, 174 F.3d at 1055 (virtually identical metatag use).  As noted in Brookfield, the identity of marks is one of the three most important factors.  174 F.3d at 1055 n.16.  The Court should find this factor weighs in favor of a likelihood of confusion.

3.      **The Degree to Which the Products Compete With Each Other.**

MTS concedes the second of the three "most important" factors in a likelihood of confusion analysis: the degree to which the products compete.  (See MTS' Mem. Law Supp. Mot. Part. S.J. at 27-28.)

It is undisputed that both Hysitron and MTS make and sell nanomechanical test instruments.  They are two of the most

---

[11] MTS admitted use of the HYSITRON mark as a sponsored link should dispel its misplaced attempt to compare the similarity of the MTS and HYSITRON marks. (MTS' Mem. Law Supp. Mot. Part. S.J. at 26-27.)  If MTS had purchased sponsored link advertising for the term "nanomechanical" or for its "MTS" mark (rather than misappropriating the HYSITRON mark), Hysitron's claims would not have been filed. The fact that the marks are identical is dispositive for this factor.  Edina Realty, 80 U.S.P.Q.2D (BNA) 1039, *15.

prominent manufacturers of nano imaging devices in the U.S., and both are well-known in their small field.

(Id.)  MTS also concedes that this competition was its motivation in purchasing the

HYSITRON mark for use in Google's advertising program:

> It is precisely for this reason that MTS sought to display advertisements on the same search result page as Hysitron: so that consumers would be presented choices among competing products.

(Id.)  MTS purchased the HYSITRON mark so that customers typing "Hysitron" would

be presented with MTS advertising disguised as relevant links.  (E.g., Platt Decl. Exs.

1-3).

On the question of direct competition between the parties there is no dispute:

where the parties compete directly, it increases the likelihood of confusion.  Edina Realty,

80 U.S.P.Q.2D (BNA) 1039, *15 (holding that the degree of competition increases the

likelihood of confusion, where plaintiff and defendant offered real estate brokerage

services, served the Twin Cities metropolitan area, and engaged in competitive use of the

Internet); accord Brookfield, 174 F.3d at 1056 (holding "proximity of their products is

actually quite high" for competing searchable online film databases).  The Court should

find that the admitted direct competition between MTS and Hysitron necessarily

increases the likelihood of confusion.

**4.    Infringer's Intent to "Pass Off" its Goods as Those of The Trademark Owner.**

**i.    Hysitron's Rule 56(f) Request for Continuance.**

MTS maintains an active refusal to provide documentation relating to its intent in

selecting the HYSITRON mark as a keyword.  (See Platt Decl. Ex. 4 (Pearson Letter).)

23

Documents and discovery sought by Hysitron will shed light on MTS' intent in adopting

the HYSITRON mark.  (Platt Decl. Ex. 5 (Requests for Production).)  MTS' internal

communications, contracts, and documentation are relevant to "nefarious" or "bad" intent

in selecting the HYSITRON mark.  E.g., Tdata Inc. v. Aircraft Tech. Publrs., 411 F.

Supp. 2d 901, 912 (S.D. Ohio 2006) ("nefarious" intent); Conversive, 433 F. Supp. 2d at

1093 ("bad intent").  Hysitron's pending discovery of the following classes of

information is relevant to intent:

- **Request No. 5.  Trademark Searches.**  MTS' knowledge of the HYSITRON mark is relevant to intent in choosing the mark for advertising purposes.

- **Request No. 17.  MTS use of "Hysitron."**  Use of the HYSITRON mark defines the scope of MTS' infringement.  Intent in adopting the mark may be inferred from the scope MTS' use of the mark.

- **Request Nos. 22-33.  Third Party Advertising.**  The scope of MTS' use of the HYSITRON mark informs the question of intent based the scope of MTS' use of the mark, its agreement with third parties, and MTS' knowledge of the effectiveness of its use of the HYSITRON mark.

- **Request Nos. 34, 35.  Website Marketing.**  Statistics, server logs, and sponsored link information may show intent based on the effectiveness of MTS' use of the HYSITRON mark.

- **Request Nos. 36, 37.  Degree of care.**  Knowledge of consumer care may show intent to divert consumers.

- **Request Nos. 39, 40, 41.  MTS enforcement actions.**  MTS own enforcement actions may provide evidence of an intent to circumvent applicable law.

- **Request No. 42.  Keyword Advertising Plans.**  Plans for keyword advertising show MTS' contemporaneous intent.

(Platt Decl., Ex. 5).  MTS' failure to produce this information prior to filing the instant motion for partial summary judgment has prejudiced Hysitron's ability to address the intent factor in opposition to MTS' motion.  (See Hinderaker 56(f) Decl. ¶ 5).

### ii.    On the Merits.

Taking every inference in favor of Hysitron, however, the Court may resolve the intent factor as weighing in favor of a likelihood of confusion.  The issue is whether MTS intended to derive a benefit from the reputation of Hysitron.  Escercizio v. Roberts, 944 F.2d 1235, 1243 (6th Cir. 1991); accord SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980) ("Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion . . . ").

A reasonable juror could conclude that MTS' selection of the HYSITRON mark "is not in a good faith, descriptive sense, but is in a bad faith, bait-and-switch, create-initial-confusion sense."  Tdata, 411 F. Supp. 2d at 912.  HYSITRON, as MTS concedes, is a coined and fanciful term.  It has no meaning except as the name of the Hysitron company.  "[W]here the alleged infringer knowingly adopts a mark similar to another's, there is a presumption that the public will be deceived."  Conversive, 433 F. Supp. 2d at 1093; see also Edina Realty, 80 U.S.P.Q.2D (BNA) 1039, *16 ("The Court finds a dispute of fact as to whether defendant has the intent to confuse consumers.").  Moreover, Hysitron's commercial activities at tradeshows and events are more extensive than MTS' activities at similar events; MTS is not as well known for its nanomechanical test equipment.  (Declaration of Oden L. Warren in Opposition to Motion for Partial Summary Judgment ("Warren Decl." ¶¶ 3-5.)  Taking every inference in Hysitron's

favor, the Court may conclude that MTS intended to confuse consumers.  In all events,

there is a dispute of fact that precludes summary judgment.

### 5.     Incidents of Actual [Initial Interest] Confusion.

### i.     Hysitron's Rule 56(f) Request for Continuance.

Hysitron's discovery requests directed to MTS' internal documentation is relevant

to actual confusion.  Hysitron's pending discovery includes the following:

- **Request No. 17, 22-33.  MTS use of "Hysitron," and Third Party Advertising.**  MTS actual use of the HYSITRON mark as a Google Sponsored Link, and its use with Third Party Advertisers, defines the scope of MTS' infringement and possible instances of actual confusion.

- **Request Nos. 34, 35.  Website Marketing.**  MTS statistics, server logs, and website traffic information will show specific information, including trends of use, from which Hysitron will be able to show patterns of use relating to MTS use of the HYSITRON mark.  Moreover, MTS' logs likely identify visitors by unique IP address.  Such information may uniquely identify visitors to the MTS website by name, or corporate affiliation.

- **Request Nos. 36, 37.  Degree of care.**  Knowledge of the degree of care exercised by consumers may include customers locating the MTS' website through searches for the HYSITRON mark.

(Platt Decl., Ex. 5).  MTS' failure to produce this information in a timely manner has

prejudiced Hysitron's ability to assert facts essential to justify its opposition on the

question of actual confusion.  (See Hinderaker 56(f) Decl. ¶ 6).

### ii.     On the Merits.

Evidence of actual confusion is solely in the possession of MTS.  However, as this

Court recognized in Coca-Cola, "actual confusion is not essential to a finding of

infringement . . . ."  74 U.S.P.Q.2D (BNA) 1048, *9-10.  In fact, actual confusion need

not be shown: a likelihood of confusion is sufficient.

> The failure to prove instances of actual confusion is not dispositive against a trademark plaintiff, because actual confusion is hard to prove; *difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy.*

Brookfield, 174 F.3d at 1050 (emphasis added).  Taking every inference in Hysitron's favor, the Court may conclude that MTS has failed to meet its burden of showing the "absence of any genuine issue of material fact" on any relevant factor.  E.g., Anderson, 477 U.S. at 255.

**6.      Whether the Degree of Care Exercised by the Consumer Can Eliminate a Likelihood of Confusion that Otherwise Would Exist.**

**i.      Hysitron's Rule 56(f) Request for Continuance.**

Hysitron's discovery requests directed to MTS' internal documentation bearing on actual confusion will also shed light on the sophistication of the consumers.  Hysitron's pending discovery includes the following:

- **Request Nos. 34, 35.  Website Marketing.**  Statistics, server logs, and sponsored link usage information will show gross volumes of traffic to the MTS website based on MTS' use of the HYSITRON mark.

- **Request Nos. 36, 37.  Degree of care.**  To the extent MTS has documentation relating to MTS' knowledge of consumer care, it will be relevant to consideration the degree of care exercised by a consumer.

(Platt Decl., Ex. 5).  MTS' failure to produce documents related to its website, and customer care, has prejudiced Hysitron's ability to assert facts essential to justify its opposition on the question of degree of care.  (See Hinderaker 56(f) Decl. ¶ 7).

**ii.      On the Merits.**

"The final factor considers whether the degree of purchaser care can eliminate any likelihood of confusion which would otherwise exist between the products."  Coca-Cola,

27

74 U.S.P.Q.2D (BNA) 1048, *11-12.  "Several courts have noted that the quick and effortless nature of 'surfing' the Internet makes it unlikely that consumers can avoid confusion through the exercise of due care . . . ."  Id. at *12.  Entering a website from a search engine takes little effort,

> usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership.

PACAAR, 319 F.3d at 252.  Moreover, initial interest confusion is not obviated by a "sophisticated" purchaser.  Grotrian, 523 F.2d at 1342.

MTS relies upon cases inapplicable on these facts.  For example, MTS cites Mars Musical Adv., Inc. v. Mars, Inc. for the proposition that ". . . the greater the cost of the product or service, the more time and effort consumers are expected to expend when making decisions, and therefore the likelihood of confusion decreases."  159 F. Supp. 2d 1146, 1153 (D. Minn. 2001) (Frost, J.).  However, time and effort expended *after* diversion of initial interest confusion is irrelevant.

> The issue here is not the possibility that a purchaser would buy a Grotrian-Steinweg thinking it was actually a Steinway or that Grotrian had some connection with Steinway and Sons. The harm to Steinway, rather, is the likelihood that a consumer, hearing the "Grotrian-Steinweg" name and thinking it had some connection with "Steinway," would consider it on that basis.

Grotrian, 523 F.2d at 1342.  Hysitron suffers a similar harm: consumers searching for Hysitron will have their interest diverted to MTS, believing it had some connection to

Hysitron, and thereby consider it on that basis.[12]  In the context of MTS' motion for

partial summary judgment, taking every inference in Hysitron's favor, the Court should

conclude that this factor supports a finding of a likelihood of confusion.

**D.      HYSITRON'S REMEDY FOR UNLAWFUL USE OF THE HYSITRON
         MARK IS AN INJUNCTION.**

MTS has characterized an injunction as "unnecessary" against conduct that is not

"*likely* to occur in the future."  (MTS' Mem. Law Supp. Mot. Prot. Ord. [Docket No. 97]

at 12-13 (emphasis added).)  Not "likely" is not good enough.

> [V]oluntary cessation of allegedly illegal conduct does not deprive
> the tribunal of power to hear and determine the case, i.e., does not
> make the case moot.

United States v. W. T. Grant Co., 345 U.S. 629, 632 (1953).  The "voluntary cessation of

a challenged practice does not deprive a federal court of its power to determine the

legality of the practice."  See Lankford v. Sherman, 451 F.3d 496, 503 (8th Cir. 2006)

(internal quotations omitted).  Moreover, the parties dispute whether MTS has actually

stopped using the HYSITRON mark.  (See Johns Decl. ¶ 12; see also Platt Decl., Ex. 6

(Gmail.)

The law recognizes that a promise to stop infringing conduct is worth little.  A

permanent injunction, and the subsequent enforcement powers of the Court, is the

appropriate remedy for infringing conduct.  Hysitron seeks what is its right: injunctive

relief forbidding MTS from trading on the renown and reputation of HYSITRON.

---

[12] In addition to MTS use of the HYSITRON mark, similarity between Hysitron's
TriboScope model numbers (i.e., TS70 and TS75) and the MTS mark could further
compound confusion regarding an affiliation between Hysitron and MTS.

1.      **The Court Must Consider the Merits of Hysitron's Lanham Act Claim Before Considering a Permanent Injunction.**

MTS' request for a prophylactic advisory opinion regarding a permanent injunction is premature: ". . . to obtain a permanent injunction the movant must attain success on the merits." Faegre & Benson, LLP v. Purdy, 447 F. Supp. 2d 1008, 1018-19 (D. Minn. 2006).  Whether Hysitron is entitled to a permanent injunction should be considered after success on the merits, not before.

i.      **MTS' request for summary judgment on the remedies available to Hysitron is improper and premature.**

The circumstances MTS' asks the Court to consider are infected with a faulty premise, a circular presumption, and bad timing.

MTS' argument is first based on the faulty premise that its mere promise to stop infringing the HYSITRON mark is sufficient to remedy its wrongful conduct.  That is not the law: the "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  See Lankford v. Sherman, 451 F.3d 496, 503 (8th Cir. 2006) (internal quotations omitted).  "If it did, the courts would be compelled to allow the defendant to return to its old practices without fear of reprisal." Lankford, 451 F.3d at 503 (citing W.T. Grant Co., 345 U.S. at 632). The defendant faces a heavy burden of showing that "the challenged conduct cannot reasonably be expected to start up again."  Id. (quoting United States v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203 (1968)).

MTS' argument with regard to Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109 (8th Cir. 1981) follows the faulty premise around a circular path leading

through each of the <u>Dataphase</u> factors.  In essence, MTS asks the Court to hold that—

should it win on the merits—Hysitron will not be entitled to an injunction.  Hysitron

respectfully suggests we consider the merits before the remedy.

Lastly, MTS' argument is poorly timed and procedurally improper.  Although

MTS has failed to provide <u>any</u> discovery related to Hysitron's trademark claims, MTS

seeks summary judgment on the remedy.  This is simply improper.  Discovery

necessarily should precede the Court's evaluation of remedies, and MTS' refusal to

participate in discovery in good faith should foreclose its attempt to limit Hysitron's

available remedies.  (<u>See</u> <u>generally</u> Hysitron's Mem. Law Supp. Mot. Compel [Docket

No. 84]).

>           **ii.     MTS infringement of the HYSITRON mark causes a**
>                     **likelihood of confusion and irreparable harm because the**
>                     **parties are in direct competition.**

To the extent the Court believes consideration of the merits is warranted, Hysitron

limits its discussion to irreparable harm.  15 U.S.C. § 1116(a) vests the district court with

the power to grant injunctions according to principles of equity and upon such terms as

the court may deem reasonable, to prevent the violation of any right of the trademark

owner.  <u>Perfumebay.com Inc. v. eBay Inc.</u>, 506 F.3d 1165, 1176-77 (9th Cir. 2007).  In

cases of Internet initial interest confusion, a broad injunction is "especially appropriate"

where the "infringing use is for a similar service"  <u>Perfumebay.com</u>, 506 F.3d at 1176-77

(affirming permanent injunction based on likelihood of confusion between Perfumebay

and eBay); <u>see</u> <u>also</u> <u>GoTo.com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199, 1210-11 (9th

Cir. 2000) (affirming preliminary injunction for "two remarkably similar marks displayed commercially on the Web [that] were likely to cause consumer confusion").

MTS' relies on eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006), which disapproved of categorical rules for the grant or denial or injunctive relief.  On its facts, eBay involved a non-competing patent holding company, willing to license its invention for money.  In this case, MTS' is a direct competitor using the HYSITRON mark to sell competing products.  Hysitron's proof of likelihood of confusion will simultaneously inform the Court regarding irreparable harm: no presumption required.  The identity of marks, and directly competing products work in concert to show irreparable harm.  See Perfumebay.com Inc., 506 F.3d at 1176-77; see also Harris Research, Inc. v. Lydon, 505 F. Supp. 2d 1161, 1168 (D. Utah 2007) (granting preliminary injunction based on infringement of "Chem-Dry" mark by "Chem-Who?" T-shirts and stickers at trade shows.)

MTS asks the Court to prejudge the merits before MTS provides discovery.  As discussed above, Hysitron has a strong likelihood of success in establishing that MTS' activities create a likelihood of initial interest confusion.  Hysitron will move for a permanent injunction following a finding in Hysitron's favor on the merits.  At that time, the Court may appropriately consider entry of a permanent injunction, irreparable harm, and the remaining Dataphase factors.  MTS' attempt to answer the question in the negative—foreclosing Hysitron's remedies without due regard for undiscovered facts—is manifestly improper.

**2.      Material Questions of Fact Preclude Summary Judgment
on the Question of Potential Harm to Hysitron.**

Encompassed in MTS' injunction discussion is a request that the Court grant

summary judgment on the issue of potential harm to Hysitron.  However, genuine issues

of material fact surround MTS' continued use of the HYSITRON mark.  MTS represents

that

> [a]lthough no formal undertaking was entered between the parties,
> MTS has discontinued the program and has no plans to resume the
> "hysitron" keyword Sponsored Link advertising in the future.

(MTS' Mem. Law Supp. Mot. Part. S.J. at 10 (citing Johns Decl. ¶ 12).)  Hysitron's

investigation after filing of this motion showed MTS' continued use of the HYSITRON

keyword as a sponsored link.  (See Platt Decl., Ex. 6 (Gmail).)  MTS counters with a new

declaration stating that it has, in fact, stopped its use of the HYSITRON mark, and that

MTS' current use of the HYSITRON mark results from a search process that associates

Hysitron and MTS.  (See Rochelle Decl. [Docket No. 105] ¶¶ 7-9.)[13]  The present

relationship between Hysitron and MTS seems a likely consequence of MTS' purchase of

the HYSITRON mark to sell MTS' products.  MTS' creative explanation

notwithstanding, the keyword "hysitron" brings up an MTS sponsored link.  (See Platt

Decl., Ex. 6 (Gmail).)

The continued use of the HYSITRON mark—by hook or by crook—is

inconsistent with MTS' representation that it has "discontinued the program and has no

plans to resume the 'hysitron' keyword Sponsored Link . . . ."  (MTS' Mem. Law Supp.

---

[13] MTS' hollow promises and Rochelle Declaration prove one point: full and fair
discovery should precede motions for summary judgment.

Mot. Part. S.J. at 10.)  In other words, HYSITRON is still being used as a sponsored link

for MTS.  (<u>See</u> Platt Decl., Ex. 6).  Regardless of MTS proffered justification, summary

judgment on the question of harm is inappropriate because genuine issues of material fact

surround MTS' continued use of the mark.

## IV.   CONCLUSION

For the reasons stated above, Hysitron respectfully urges the Court to DENY

MTS' motion for partial summary judgment, or in the alternative, grant Hysitron's Rule

56(f) request for continuance.

Dated:  May 9, 2008                     By: /s/ Brian N. Platt
                                              Allen W. Hinderaker #45287
                                              Tong Wu #0288974
                                              Brian N. Platt *pro hac vice*
                                              MERCHANT & GOULD P.C.
                                              80 South Eighth Street, #3200
                                              Minneapolis, MN 55402-4131
                                              Telephone No.: 612.332.5300
                                              **ATTORNEYS FOR PLAINTIFF**
                                              **HYSITRON INCORPORATED**